COMMONWEALTH vs. DANIEL J. CURTIS
(and two companion cases[1]).

Suffolk.  November 2, 1982. — April 7, 1983.

Present: HENNESSEY, C.J., ABRAMS, NOLAN, & LYNCH, JJ.

*Homicide. Witness,* Immunity. *Constitutional Law,* Self-incrimination,
    Witness, Admissions and confessions, Waiver of constitutional rights.
    *Supreme Judicial Court,* Superintendence of inferior courts.

A judge correctly denied criminal defendants' motion to order the prose-
    cutor to seek immunity from prosecution under G. L. c. 233, §§ 20D
    and 20E, for a prospective defense witness. [643]
Neither the compulsory process provisions of the Federal Constitution, as
    applicable to the States through the due process clause of the Fourteenth
    Amendment, nor cognate provisions of the Massachusetts Constitution,
    entitled the defendants in a criminal case to a judicial grant of immunity
    from prosecution to a prospective defense witness. [643-646]
A single justice of this court did not abuse his discretion in denying a peti-
    tion under G. L. c. 211, § 3, for a grant of immunity from prosecution
    to a prospective defense witness at the petitioners' trial for murder.
    [646]
A judge's ruling at a criminal trial that, if the defendants testified at a
    pretrial hearing on their motion for a grant of immunity to a prospec-
    tive defense witness, they would thereby waive their privilege against
    self-incrimination in regard to that testimony did not violate their due
    process guarantees under the rationale of *Simmons* v. *United States,*
    390 U.S. 377 (1968), where, since the defendants had no constitutional
    right to obtain the requested immunity, they were not confronted with
    the dilemma of choosing between two constitutional rights.  [647]
No error appeared in a judge's denial of a criminal defendant's motion to
    suppress his statements to police, where the evidence warranted the

[1] One of the companion cases is by the Commonwealth against Mark J.
Giglio.  An additional defendant, Louis Lepore was tried with Curtis and
Giglio, was found guilty of assault and battery, and received a two and
one-half year suspended sentence with probation for five years.  Lepore
did not appeal his conviction.  The second companion case is the defend-
ants' petition for a grant of immunity to a prospective witness by a single
justice of this court.  Curtis and Giglio appeal from the denial of that peti-
tion.

judge's findings that the defendant fully understood his Miranda rights at the time he made the statements, that his statements were given voluntarily following an intelligent and voluntary waiver of his Miranda rights, and that alleged threats by a third party neither so disturbed the defendant that he was unable to understand his Miranda rights nor coerced him into inculpating himself. [647-651]

INDICTMENTS found and returned in the Superior Court Department on August 7, 1980.

The cases were tried before *Brogna,* J.

The Supreme Judicial Court granted a request for direct appellate review.

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on December 11, 1980.

The case was heard by *Liacos,* J.

*William C. Madden* for Daniel J. Curtis.

*Michael J. Traft,* Assistant District Attorney (*Albert A. DeNapoli,* Legal Assistant to the District Attorney, with him) for the Commonwealth.

*Alan Chapman,* for Mark Giglio, submitted a brief.

LYNCH, J. On December 30, 1980, the defendants Daniel J. Curtis and Mark J. Giglio were convicted by a jury of murder in the second degree in the beating death of Michael Robinson. The defendants were sentenced to life imprisonment. The defendants appeal from these convictions claiming that error was committed by the trial judge in (1) failing to grant immunity to a defense witness; (2) ruling that if the defendants testified at the hearing on their motion to have a defense witness immunized they would thereby waive their Fifth Amendment privilege against self-incrimination; and (3) failing to suppress a statement made by the defendant Mark Giglio after he was in the custody of the police. Additionally, the defendants appeal from the denial by a single justice of this court of their petition under G. L. c. 211, § 3, requesting a grant of immunity to a defense witness. We granted the defendants' application for direct appellate review of their convictions and consolidated their appeals with the appeal from the single

justice's decision. We conclude that there was no error and affirm the convictions.

We summarize the evidence and the proceedings below relevant to these appeals. On the evening of July 14, 1980, Michael Robinson, a sailor assigned to the U.S.S. Edson, a ship under repair in the General Shipyard in East Boston, was beaten by a group of East Boston youths on Border Street in a brawl between some sailors and the youths. Robinson died eight days later from head injuries inflicted in that beating. The incident which precipitated the fray is a matter of dispute. Lenny T. Curtis, the brother of the defendant, Daniel Curtis, testified at the trial that on that evening he had been jostled and struck by one of the black sailors sitting outside the General Shipyard fence when he refused to give him a cigarette. A sailor who testified stated that Curtis walked by undisturbed by the sailors.

Curtis testified that after this alleged attack he told his friend, Eddie Colon, to "[g]o get my two brothers." Colon rode his bicycle toward the Central Square area of East Boston and saw the defendant, Mark Giglio, and two other friends, Michael Brulport and Joseph DeDominicis. Colon told them that "Lennie needs some help down there. Some sailors [are] bothering him." The four youths proceeded back to the place where the sailors were sitting.

The youths approached the sailors and began making abusive comments.[2] Some white sailors, including Michael Robinson, joined the other sailors and told the youths to leave the sailors alone. At this point, a red Cadillac automobile driven by Louis Lepore arrived at the scene and stopped. Daniel Curtis was a passenger in this car. Giglio ran over to the car and told Curtis that his brother Lenny Curtis had been beaten "by those sailors over there." According to Giglio's testimony, some of the youths then ran over to Lepore's car and began taking bats from the trunk.

---

[2] Testimony was presented at the trial that some of the youths yelled at the black sailors, "Go home, niggers. We don't want you around here."

Sensing imminent trouble, the sailors began walking back to the shipyard.  A gang of youths began chasing them.  While fleeing, Michael Robinson either tripped and fell or was pushed to the ground.  Two sailors, Seaman Tony Webb and Petty Officer Rickie Brandford, testified that they saw a number of the youths attack Robinson with baseball bats and a bottle.  During the attack, Seaman Webb concentrated on one assailant.  Webb later identified Daniel Curtis as this assailant from a police photo identification book, and subsequently repeated this identification at a District Court hearing, and at the trial.  Eddie Colon, who had originally summoned the other youths, testified that he saw Mark Giglio strike Robinson with a bottle while Robinson was on the ground.

After attacking Robinson, the youths retreated and Webb and Brandford returned to help Robinson.  The sailors found Robinson unconscious and bleeding from his head.  The police and an ambulance arrived shortly thereafter and Robinson was taken to Massachusetts General Hospital.  He was examined there by Dr. Tagi, the chief resident of neurosurgery.  Dr. Tagi testified that the victim had sustained severe head injuries resulting in a minimum of ten fractures which were caused by at least five "very considerable" blows.  The object that caused the injuries, the doctor stated, "was a blunt instrument wielded with an awful lot of force . . . many times."  These injuries, he stated, were consistent with those that could be inflicted with a baseball bat or a full bottle.

After a police investigation, the defendants Curtis and Lepore were called to the East Boston police station, where they both made statements.  On July 22, Michael Robinson died of the injuries he sustained in the beating.  The next day Curtis and Lepore were arraigned in the East Boston District Court for their involvement in the murder.

On August 7, 1980, a Suffolk County grand jury indicted Daniel J. Curtis, Mark J. Giglio, and Louis Lepore for murder in the first degree of Michael Robinson.  On December 8, 1980, Giglio filed a substituted motion to sup-

press statements he made to the police on the grounds that they were obtained in violation of his Miranda rights and that any waiver of his rights which he had made was not voluntary. The judge denied this motion.

Prior to the start of the trial the defendants moved for the judge to order the prosecutor to seek a grant of immunity from prosecution, under the provisions of G. L. c. 233, §§ 20D and 20E, for Joseph DeDominicis, a prospective defense witness who had been present at the brawl. In support of this motion the defendant Curtis filed an affidavit stating that he saw another person named Richard Mazzone hit the victim with a baseball bat and that DeDominicis was in a position to observe this. The Commonwealth opposed the motion on the ground that it would interfere with an ongoing "John Doe" grand jury investigation into the possible participation of others in this crime. DeDominicis had been called before this grand jury and had invoked his privilege against self-incrimination.

At the hearing on this motion, DeDominicis again asserted his Fifth Amendment privilege on the advice of counsel. DeDominicis' lawyer told the judge that his client was seeking full transactional immunity from prosecution prior to his waiving his privilege against self-incrimination. Lepore's attorney on behalf of all the defendants then recited an offer of proof to the judge as to what DeDominicis would testify if granted immunity. Lepore's attorney stated that DeDominicis would testify to being present at the incident and seeing Richard Mazzone club the victim twice with a baseball bat. After hearing this offer of proof, the judge denied the motion.

On December 11, the defendants requested a single justice of this court to grant immunity to DeDominicis under G. L. c. 211, § 3.[3] After a hearing, the single justice

---

[3] At the hearing before the single justice all the parties agreed that the immunity request was beyond the scope of G. L. c. 233, §§ 20C and 20I, which regulates grants of immunity sought by the Attorney General or a district attorney. See generally *Grand Jurors for Middlesex County for the Year 1974* v. *Wallace,* 369 Mass. 876, 879-880 (1976).

reserved his decision until the Commonwealth's cases were presented at the trial so that he would be better able to determine whether the testimony of the witness would be necessary.

After the prosecution had completed its cases, the defendants filed another motion with the trial judge asking him to grant judicial immunity for DeDominicis under his "inherent" power to assure the defendants a fair trial. The judge conducted a voir dire hearing on this motion in which DeDominicis again claimed his Fifth Amendment privilege. The judge then met privately with the witness and his counsel. DeDominicis agreed to allow his attorney to relate to the judge what the substance of his testimony would be if he were granted immunity. At this conference the witness' counsel stated that DeDominicis would testify that he was able to see, at least during a portion of the fight, that Curtis and Giglio did not have weapons. Further DeDominicis would testify that he did not see who hit the victim but that he did see Mazzone standing over the victim with a bat in his hand. The judge denied this motion and ordered the transcript of the lobby conference impounded as well as his findings and rulings based on it.

Subsequently, the defendants renewed their petition before the single justice. The impounded material was delivered to the single justice, who examined it. He denied the defendants' petition. The impounded material eventually was released to the defendants' attorneys on June 7, 1982, by order of a single justice of this court.

1. *The defendants' motions to immunize the witness DeDominicis.* The defendants appeal from the denial by the judge of their motions for him either (a) to order the Commonwealth to seek a grant of immunity under G. L. c. 233, §§ 20D and 20E, for the prospective defense witness DeDominicis, because the witness would assert his Fifth Amendment right against self-incrimination if called to testify at trial or (b) to fashion a "judicial immunity" himself for the witness to preserve the defendants' rights under the Fifth, Sixth, and Fourteenth Amendments to the

United States Constitution, and art. 12 of the Declaration of Rights of the Massachusetts Constitution. Although these motions seek the same result, they are based on distinct statutory and constitutional grounds and we shall discuss them separately.

a. The judge properly denied the defendants' motion to order the prosecutor to seek a grant of immunity under the statute. G. L. c. 233, §§ 20C and 20I. The statutory scheme provides no mechanism for a judge of the Superior Court to order the prosecutor to seek a grant of immunity. Rather, the only provision of the statute giving the Superior Court power to grant immunity provides that a "justice of the superior court, *may, at the request of the attorney general or a district attorney,* issue an order granting immunity to a witness," provided that the other requirements of the statute are met (emphasis added).[4] G. L. c. 233, § 20F, inserted by St. 1970, c. 408.

b. The defendants' claim that they have a constitutional right to have a defense witness immunized presents a novel issue to this court.[5] The defendants contend that by denying their motions the judge deprived them of their rights to compulsory process, to a fair trial, and to due process of law under the Sixth and Fourteenth Amendments, and art. 12 of the Declaration of Rights.

This argument is predicated first on the defendants' contention that the compulsory process clause of the Sixth Amendment, applicable to the States under the due process clause of the Fourteenth Amendment, *Washington* v. *Texas,* 388 U.S. 14 (1967), and the similar provisions of art. 12,[6] should be extended to guarantee the defendants not

---

[4] These requirements include that a single justice of the Supreme Judicial Court has previously issued an order granting immunity. G. L. c. 233, § 20E.

[5] The defendants did not state in their motion or in their argument here whether they sought use immunity or transactional immunity for the witness. For the purpose of this appeal we shall assume that the defendants sought only the more limited grant of use immunity.

[6] In pertinent part, the Sixth Amendment provides: "[T]he accused shall enjoy the right . . . to have compulsory process for obtaining witnesses

only the production of witnesses, but also access to the testimony of witnesses who invoke their Fifth Amendment privilege against self-incrimination. The defendants argue that their "right to present a defense" guaranteed by the compulsory process clause and principles of due process, see *id.* at 19, and to compel witnesses to appear is meaningless without the concomitant right to compel a reluctant witness to testify even though the witness asserts his own constitutional right against self-incrimination. If the prosecution refuses to extend immunity to the witness, they contend that the court must grant the witness "judicial immunity" in order to ensure that the defendants receive a fair trial.

Those courts which have considered such claims for defense witness immunity have almost uniformly rejected them. See, e.g., *United States* v. *Turkish,* 623 F.2d 769, 773-774 (2d Cir. 1980), cert. denied, 449 U.S. 1077 (1981); *United States* v. *Lenz,* 616 F.2d 960, 962-963 (6th Cir.), cert. denied, 447 U.S. 929 (1980); *United States* v. *Smith,* 542 F.2d 711, 715 (7th Cir.), cert. denied, 429 U.S. 1027 (1976); *United States* v. *Alessio,* 528 F.2d 1079, 1081 (9th Cir.), cert. denied, 426 U.S. 948 (1976); *Thompson* v. *Garrison,* 516 F.2d 986, 988 (4th Cir.), cert. denied, 423 U.S. 933 (1975). But see *Government of the V.I.* v. *Smith,* 615 F.2d 964 (3d Cir. 1980). The defendants base their argument on the holding in the *Smith* case. However, as the Court of Appeals for the Second Circuit has stated in discussing that case, "*Smith* involved a totally bizarre situation." See *United States* v. *Turkish, supra* at 773. In *Smith,* a defendant, being prosecuted by the office of the United States Attorney, had sought a grant of use immunity for a juvenile defense witness. The office of the Attorney General of the Virgin Islands, which had exclusive jurisdiction to prosecute the witness, agreed to grant use immunity for the witness, but, as a matter of "prosecutorial courtesy," conditioned its approval upon the consent of the United

---

in his favor . . . ." Article 12 provides that "every subject shall have the right to produce all proofs, that may be favorable to him . . . ."

States Attorney, who inexplicably refused to consent. *Smith, supra* at 967. This unusual prosecutorial conduct was a major reason that the court authorized the trial judge to grant immunity to the defense witness: "Finally, and most important, the fact that the United States Attorney had no jurisdiction over [the witness] as a juvenile and gave no justification for refusing to consent to the immunity offered by the juvenile authorities who did have jurisdiction over [the witness], suggests that the prosecution deliberately intended to keep this highly relevant, and possible exculpatory, evidence from the jury." *Id.* at 969. To the extent that the court's decision was based on broader constitutional grounds we find its reasoning unpersuasive and generally agree with the reasoning put forth by the other Federal circuits in rejecting such claims for defense witness immunity. These decisions have recognized that the determination of whether to seek a grant of immunity from the prosecution for a witness primarily involves public interest considerations best evaluated by the prosecutor. In most circumstances where a defendant seeks immunity for a prospective defense witness, the prosecutor is likely to have a strong, valid interest in opposing such immunity. Such a witness is likely to be an actual or potential target to whom a prosecutor will be reluctant to grant the benefits of immunity. See *Turkish, supra* at 778.

Here, the prosecutor clearly established that the Commonwealth had a strong interest in opposing a grant of immunity. The prosecutor opposed the motions of the defendants on the ground that such immunization would interfere with an ongoing "John Doe" grand jury investigation into the incident. DeDominicis had already been called before this grand jury and had invoked his Fifth Amendment rights there. Since DeDominicis had been present at the incident and, in fact, had accompanied Giglio to the scene, he was certainly a potential suspect in the continuing investigation. In these circumstances, we conclude that the judge properly denied the defendants' motions.

We recognize that the assertion by a witness of his Fifth
Amendment right may in some cases hinder a defendant's
ability to present his most effective defense. However, we
do not believe that this potential problem justifies creation
of a general doctrine of judicial immunity for defense wit-
nesses. As we have previously stated, "the constitutional
right of the accused to call witnesses is not without limit."
*Commonwealth* v. *Blaikie,* 375 Mass. 601, 608-610 (1978).
Nor is the defendant's right to present witness testimony in
his own behalf absolute. See *United States* v. *Nobles,* 422
U.S. 225, 241 (1975) (trial judge may control scope of ex-
amination); *Hamling* v. *United States,* 418 U.S. 87, 127
(1974) (trial judge may refuse to allow cumulative,
repetitive, or confusing evidence). Accordingly, without
precluding the possibility that in some unique circumstances
not presented by the facts before us due process may require
the granting by a judge of a limited form of immunity, we
decline to hold that the compulsory process provisions of the
Federal Constitution applicable to the States through the
due process clause of the Fourteenth Amendment, or the
cognate provisions of our State Constitution, mandate a
grant of immunity to the prospective defense witness in this
case.

2. *The denial by the single justice of the defendants' peti-
tion for witness immunization.* The defendants appeal
from the single justice's denial of their petition that he im-
munize the witness DeDominicis through use of this court's
superintendency power under G. L. c. 211, § 3. The stand-
ard of review for orders entered by the single justice under
G. L. c. 211, § 3, is that such orders shall not be disturbed
absent an abuse of discretion or error of law. *Cefalu* v.
*Globe Newspaper Co.,* 377 Mass. 907 (1979). *Healy* v. *First
Dist. Court of Bristol,* 367 Mass. 909 (1975). The single
justice considered the same offer of proof as was put before
the trial judge. For the reasons stated in our discussion
above involving the judge's denial of the defendants' mo-
tions we discern no error of law or abuse of discretion in the
single justice's denial of the defendants' petition.

3. *The judge's refusal to allow pretrial testimony by the defendants without waiver of their Fifth Amendment rights.* At the pretrial hearing on the defendants' motion to immunize the prospective defense witness DeDominicis, the judge ruled that if the defendants testified they would waive their Fifth Amendment rights in regard to this testimony. The defendants contend that this ruling violated their rights to due process of law under the rationale of *Simmons* v. *United States,* 390 U.S. 377 (1968). We find this argument unpersuasive. In *Simmons,* the Supreme Court held that "when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection." *Id.* at 394. *Simmons* is based on the rationale that a defendant should not be forced to surrender his right to the protections of the Fifth Amendment in order to preserve his rights under the Fourth Amendment. Here, the defendants were not confronted with the dilemma of choosing between two constitutional rights because they had no constitutional right to have a defense witness immunized. Therefore, the holding in *Simmons* is inapposite to the situation presented in this case and the judge's ruling did not deprive the defendants of due process of law.[7]

4. *Giglio's motion to suppress his statements.* The defendant Giglio contends that the judge committed reversible error in denying his motion to suppress the statements he made to the police on the day he was arrested. The defendant in his motion and an accompanying affidavit argued that his waiver of his Miranda rights was involuntary because his will was overborne by the threats of a third party, Glen Curtis, a brother of the defendant Daniel Curtis.

After holding a suppression hearing, the judge found the following facts. On July 22, 1980, Glen Curtis went to

---

[7] We note that the defendants suffered no prejudice from this ruling as the judge allowed their attorneys to present the gist of their proposed testimony through an offer of proof.

Giglio's house and told Giglio that he should turn himself in to the police because "[m]y brother is not going to take the 'rap' alone." Giglio, accompanied by Curtis, then went to the East Boston police station, entered alone, and asked the police if they had any outstanding warrants for him. Giglio left the police station after being informed that no warrant had been issued. He informed Curtis of this but Curtis urged Giglio to surrender himself anyway. Giglio refused and they walked a short distance down the street together before separating.

Later that evening Curtis saw Giglio again and in anger allegedly stated that if he had a gun he would "kill all of them," referring to the youths who had been involved in the incident. The judge found that if this statement were made, it was not done in the context of a specific threat directed against Giglio and that this statement did not instill fear in Giglio for his personal safety. Giglio then returned to his home.

When Giglio entered his home, he told his mother that he wanted a lawyer and she telephoned an attorney who telephoned the police and he also asked whether any arrest warrants for Giglio had been issued. The police stated that there were none but that they wanted to speak with his client. The lawyer arranged to bring Giglio into the station the next day at 3 P.M. The next day, however, Giglio first went to the arraignment of Daniel Curtis and Louis Lepore. Following the arraignment, Giglio voluntarily sought out Detective Charles Gleason who, on finding out that Giglio wished to discuss the incident, fully informed the defendant of his Miranda rights before speaking with him. Gleason also asked the defendant if he had a lawyer. When Gleason discovered that Giglio was to meet his lawyer at 3 P.M. that day, Gleason offered to wait until then to speak to Giglio and informed Giglio that, depending on what was said, Giglio might be charged with murder. Giglio declined this offer to wait and insisted on speaking with Gleason then. Only after the defendant had indicated that he understood his rights and did not want to wait for his lawyer did Glea-

son continue their talk. After the defendant made an initial inculpatory statement Gleason decided to transport Giglio to the police headquarters for a more formal interrogation. Before leaving the court house Gleason asked Giglio if he would like to make a telephone call but Giglio said it was unnecessary. The interview at the police headquarters was conducted by an assistant district attorney. Prior to conducting this interrogation the assistant district attorney again explained to Giglio his constitutional rights and again offered to wait for Giglio's attorney. Giglio insisted on making his statement and the formal interrogation proceeded and resulted in the statements Giglio now seeks to suppress.

After hearing the witness' testimony and listening to the tape recording made of this interrogation, the judge concluded that Giglio fully understood his Miranda rights at the time he made the statements, understood that he could wait until his lawyer arrived, and also understood that he could stop answering any question until his lawyer arrived. The judge further found that the defendant's statements to the police were given voluntarily and that he had intelligently and voluntarily waived his Miranda rights. The judge concluded that Giglio was not so disturbed by threats from Glen Curtis that he was unable to understand his Miranda rights or was coerced by this third party into making inculpatory statements.

In reviewing a trial judge's conclusion that a defendant voluntarily waived his Miranda rights, the judge's subsidiary findings are to be accepted if they are warranted by the evidence. *Commonwealth* v. *Tavares*, 385 Mass. 140, 144-145 (1982). While the judge's ultimate findings are subject to review, a finding of voluntary waiver is entitled to substantial deference by this court. *Commonwealth* v. *White*, 374 Mass. 132, 138 (1977), aff'd, 439 U.S. 280 (1978). However, we fulfil our appellate function by independently determining the correctness of the judge's application of the relevant constitutional principles to the facts found. *Commonwealth* v. *Haas*, 373 Mass. 545, 550 (1977).

Our review of the judge's rulings reveals no error. The defendant voluntarily approached the officer to make a statement. As the Supreme Court of the United States has stated, "There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime . . . . Volunteered statements . . . are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Miranda* v. *Arizona*, 384 U.S. 436, 478 (1966). Both before and after Giglio was taken into custody the police and the assistant district attorney acted assiduously to safeguard the defendant's rights. As the judge found, two different police officers and the assistant district attorney explained to the defendant his rights and asked him if he preferred to wait for his lawyer.

The defendant's arguments that the "threats" of Glen Curtis coerced him into making these statements is not supported by the evidence. While it is true that a "conviction founded in whole or in part on statements which are the product of physical or psychological coercion deprives the defendant of his right to due process of law under the Fourteenth Amendment and, as a consequence, is invalid" and "[t]hese principles apply even though the statements were extracted by private coercion, unalloyed with any official government involvement," *Commonwealth* v. *Mahnke*, 368 Mass. 662, 679-680, cert. denied, 425 U.S. 959 (1976), the facts presented here do not demonstrate any such extreme coercion by Curtis on the defendant. Nor is any causal connection shown between the defendant's statements and the urgings of Curtis. Although Curtis frequently admonished Giglio to confess his participation in the crime, Giglio was not decisively swayed. While some of Giglio's actions demonstrated an inclination to appease Curtis, Giglio's behavior also reveals an independent decision process. After leaving the police station on the night of July 22, Giglio ignored Curtis' order to turn himself in despite the absence of a warrant for his arrest. Instead Giglio sought out the advice of a lawyer. Similarly, when Giglio approached Detective Gleason in the court house the next day he did so

freely. When Gleason took the defendant into custody, Giglio was removed from any influence Curtis might have exerted. The record reveals that Giglio was advised that his statements could result in a murder charge against him and that he could consult with his lawyer. These conditions do not remotely resemble the situation of a "[statement] extracted by a howling lynch mob or a lawless pack of vigilantes from a terrorized, pliable suspect" which we condemned in *Mahnke, supra* at 681. Rather, they suggest an individual impelled by his conscience to admit voluntarily his participation in a brutal beating. No error was committed in admitting his statements.

5. In summary, we find no error in any of the rulings below from which the defendants have appealed and we decline to disturb their convictions. Additionally there was no error in the decision of the single justice on the defendants' petition.

*Judgments affirmed.*