COMMONWEALTH vs. GEORGE L. UPTON.

Barnstable. January 3. September 12, 1983. — December 12, 1983.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Probable Cause. Constitutional Law,* Search and seizure, Probable cause, Self-incrimination, Witness. *Search and Seizure,* Probable cause. *Witness,* Immunity.

Discussion of the standards expressed by the Supreme Court of the United States in *Illinois* v. *Gates,* 462 U.S. 213 (1983), concerning search warrants issued on the basis of disclosures by unnamed informants. [566-569]

The affidavit of a police officer who had spoken by telephone with an anonymous informant was not sufficient to establish probable cause for the issuance of a search warrant under principles expressed by the Supreme Court of the United States in *Aguilar* v. *Texas,* 378 U.S. 108 (1964), and *Illinois* v. *Gates,* 462 U.S. 213 (1983), where a basis for assessing the credibility of the informant and the reliability of her information was not present, where such corroboration as was present related to innocent and nonsuspicious conduct, together with her knowledge that police had raided a third person's motel room, and where the source of her knowledge that stolen property was to be found in the place she identified was not revealed with sufficient strength to bolster deficiencies in other relevant aspects of the affidavit. [569-574] LYNCH, J., dissenting, with whom NOLAN, J., joined, would uphold the sufficiency of the affidavit on the authority of *Illinois* v. *Gates, supra* [578-582].

Where the Commonwealth had not argued, at the hearings on a criminal defendant's motion to suppress evidence, that the search by police of a certain motor home was justified by exigent circumstances, this argument came too late for consideration on the defendant's appeal from the denial of his motion. [574-575]

The record of a criminal trial, resulting in convictions which were reversed by this court on another ground, did not establish a due process requirement for a judicial grant of use immunity to a potential defense witness who relied upon the privilege against self-incrimination secured to him by the Fifth Amendment to the United States Constitution. [575-577]

INDICTMENTS found and returned in the Superior Court Department, three on October 7, 1980, and two on March 10, 1981.

Pretrial motions to suppress evidence were heard by
*Dolan*, J., and *Lynch*, J., and the cases were tried before
*Wagner*, J.

The Supreme Judicial Court granted a request for direct
appellate review.

*Nancy Gertner* (*Susan Sturm & Josephine Ross* with her)
for the defendant.

*Gary A. Nickerson*, Assistant District Attorney, for the
Commonwealth.

*Francis X. Bellotti*, Attorney General, & others, amici
curiae, submitted a brief.

WILKINS, J. The defendant, in his appeal from numerous
convictions, principally challenges the lawfulness of a search
conducted pursuant to a search warrant. He asserts that
the affidavit presented in support of that search warrant
failed to establish probable cause to issue it. The search
produced substantial amounts of stolen property that led to
the several indictments on which the defendant was con-
victed. We conclude that, under controlling principles an-
nounced by the Supreme Court of the United States, the
search was unreasonable in violation of the Fourth Amend-
ment to the Constitution of the United States because there
was no demonstrated probable cause to issue the search
warrant. We thus reverse the convictions.[1]

About noon on September 11, 1980, Lieutenant Beland of
the Yarmouth police department assisted in the execution of
a search warrant for a room at the Snug Harbor Motel in
West Yarmouth. The search warrant mentioned one Kelle-
her. The police found various items, some containing the
name of one Pendergast whose premises had been burglar-
ized earlier that month. In the middle of the afternoon,
Beland received a telephone call from an unidentified woman

---

[1] We allowed the Commonwealth's application for direct appellate re-
view, to which the defendant assented.

The defendant was convicted on two counts of breaking and entering in
the daytime with intent to commit a felony, two counts of larceny from a
building, seven counts of receiving stolen property, unlawful possession of
fireworks, and unlawful possession of an interception device (see G. L.
c. 272, § 99).

who, according to Beland's affidavit in support of the warrant, said that "a motor home full of stolen stuff [is] parked behind #5 Jefferson Ave., the home of [the defendant] and his mother." The affidavit, the significant portions of which appear in the margin,[2] sets forth the conversation further.

[2] "I was in attendance at room #32 of the Snug Harbor Motel in West Yarmouth on Sept. 11, 1980, at approximately 12:00 PM. I was assisting Ptlm. Raymond Scichilone of the Yarmouth Police Dept. in his execution of a search warrant. The room had been registered to a Christine Higgins and the reservation had been made by a Richard Kelleher. While executing this search warrant, several items of identification, including credit cards, in the names of Dr. Austin O'Malley and J. Pendergast were located in a wallet that had been in a maroon purse which was situated on the mirrored dresser in the rear of the motel unit. These items were seized and turned over to Det. James Tamash of the Barnstable Police Dept. Det. Tamash also had copies of the theft reports that had been reported to the Barnstable Police Dept. by Dr. O'Malley and J. Pendergast, on Sept. 4, 1980 and Sept. 10, 1980, respectively. These lists include a large quantity of gold and silver jewelry.

"On Sept. 11, 1980, at approx. 3:20 PM, this officer received a call from an unidentified female stating that there is a motor home full of stolen stuff parked behind #5 Jefferson Ave., the home of George Upton and his mother, name unknown. This unidentified female also told me that the stolen items consisted of jewelry, gold, silver, Television sets and a quantity of narcotics. She further stated that George Upton was going to move the motor home any time now because of the fact that Ricky Kelleher's motel room was raided and that George had purchased these stolen items from Ricky Kelleher. This unidentified female stated that she had seen the stolen items but refused to identify herself because "he'll kill me," referring to George Upton. I then told this unidentified female that I knew who she was, giving her the name of Lynn Alberico, who I had met on May 16, 1980, at George Upton's repair shop off Summer St., in Yarmouthport. She was identified to me by George Upton as being his girlfriend, Lynn Alberico. The unidentified female admitted that she was the girl that I had named, stating that she was surprised that I knew who she was. She then told me that she'd broken up with George Upton and wanted to burn him. She also told me that she wouldn't give me her address or phone number but that she would contact me in the future, if need be.

"On Sept. 11, 1980, I drove to #5 Jefferson Ave., West Yarmouth, and observed a white, Dodge Tioga Motor Home parked on the premises, immediately to the left of the dwelling, encircled by a 6' high stockade fence. I therefore am requesting a search warrant to search the entire premises, including any vehicles parked thereon, and curtilage, as I feel I have probable cause to believe that any/all of the items listed on attached sheets marked "B", "C", "D", are to be found on and within the described premises."

The informant described the stolen items generally and said that the defendant was going to move the motor home because Kelleher's motel room had been raided. She said the defendant had purchased the stolen items from Kelleher. She said she had seen the items, although she did not state when and where she had seen them. In further conversation, she agreed to Beland's suggestion that she was Lynn Alberico, a former girl friend of the defendant. Later that day Beland went to 5 Jefferson Avenue and saw a motor home parked on the premises. He then prepared the application for a search warrant, obtained the warrant while other officers watched the premises, and, with four other officers, executed the warrant on the evening of the same day. Numerous items were seized in the course of searching the motor home.

The defendant filed two motions to suppress the evidence seized at the motor home. A Superior Court judge heard and denied the first motion, filed with respect to charges set forth in an initial group of indictments. When further indictments were returned involving additional charges against the defendant, he filed another motion to suppress. A second Superior Court judge heard that motion and denied it. The judges' findings concerning the issuance of the warrant to search the motor home were substantially the same.[3]

At the trial before a third Superior Court judge, Kelleher testified to his participation in breaking and entering certain homes with one Jimmy Ellis. He testified that the defendant served as a lookout and that the defendant paid him

---

[3] The second judge expressed serious misgivings whether he should have heard evidence on the second motion. The issues available for argument on the second motion were available for argument on the first. The available evidence was the same; the same application for a search warrant was involved in each motion. If the available issues and relevant facts are the same on two successive motions seeking substantially identical relief, we see no reason to require a full hearing on the second motion, unless the applicable law has changed since the first hearing. See *Commonwealth v. Richmond,* 379 Mass. 557, 558 (1980). In his discretion a second judge, of course, could hold a second hearing or, where substantial justice requires, permit the first motion to be renewed. See Mass. R. Crim. P. 13 (a) (5), 378 Mass. 871 (1979).

for the stolen objects which were taken to the motor home. The defendant sought unsuccessfully to obtain immunity from the trial judge for Jimmy Ellis. The defendant asserted that Ellis would testify that the defendant had nothing to do with the house breaks at the Pendergast residences and that Kelleher had disposed of the stolen property after dropping Ellis off at his house. We turn first to the defendant's challenge to the search warrant.

1. This case was argued before us in January, 1983, in terms of the application to this case of principles expressed in *Aguilar* v. *Texas,* 378 U.S. 108 (1964), and *Spinelli* v. *United States,* 393 U.S. 410 (1969), concerning search warrants issued on the basis of disclosures by unnamed informants. On June 8, 1983, the Supreme Court of the United States decided *Illinois* v. *Gates,* 462 U.S. 213 (1983). The opinion of the Court in the *Gates* case, joined in by five Justices, states that the existence of probable cause to issue a search warrant should be determined by considering the "totality-of-the-circumstances" shown in the affidavit in support of the issuance of the warrant. *Id.* at 238. In so stating the standard to be applied where an affidavit relied on an informant's tip, the Court repudiated overly technical interpretations of the "two-pronged test" generally understood to be applicable under that Court's opinions in the *Aguilar* and *Spinelli* cases. The "two-pronged test" required that the magistrate be informed of (1) some of the underlying circumstances from which the informant concluded that the contraband was where he claimed it was (the basis of knowledge test), and (2) some of the underlying circumstances from which the affiant concluded that the informant was "credible" or his information "reliable" (the veracity test). *Aguilar* v. *Texas, supra* at 114. If the informant's tip does not satisfy each aspect of the *Aguilar* test, other allegations in the affidavit that corroborate the information could support a finding of probable cause. *Spinelli* v. *United States, supra* at 415.

In the *Gates* opinion, the Court noted that "veracity" and "'basis of knowledge'" are highly relevant in determining

the value of an informant's disclosures, but it rejected the idea that these were "separate and independent requirements to be rigidly exacted in every case." *Illinois* v. *Gates, supra* at 230. "[A] deficiency in one [prong] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Id.* at 233. As the Court viewed the matter, "[t]he task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed. *Jones* v. *United States*, 362 U.S. at 271. . . . We are convinced that this flexible, easily applied standard will better achieve the accommodation of public and private interests that the Fourth Amendment requires than does the approach that has developed from *Aguilar* and *Spinelli*." *Illinois* v. *Gates, supra* at 238-239. In view of this new standard, said to be "flexible" and "easily applied," like some commercial product, this court issued an order on June 30, 1983, asking for supplemental briefs and further oral argument in light of the *Gates* opinion.[4]

---

[4] Our order read in part: "In light of the *Gates* opinion, the Court requests that the parties agree on a schedule for the prompt briefing, and subsequent oral argument before the Justices, of these issues: (1) the effect of the *Gates* opinion on this case and (2) what, if any State law, including constitutional requirements, should be applied in determining the admissibility of the evidence seized pursuant to the search warrant."

In our order we invited briefs from amici curiae. We appreciate the help provided to us by each brief filed as amicus curiae. A brief on behalf of the Attorney General and most of the Commonwealth's district attorneys argues that the *Gates* standard of "totality of the circumstances" is consistent with the requirements of art. 14 of the Declaration of Rights of the Constitution of the Commonwealth. A second brief, filed by Mr. Stephen R. Kaplan, who had served as an assistant district attorney for the Northwestern District for ten years, argues that, if the *Gates* opinion has depressed the Fourth Amendment standard of probable cause, this court must use art. 14 to assure the application of proper standards.

It is not clear that the *Gates* opinion has announced a significant change in the appropriate Fourth Amendment treatment of applications for search warrants. Looking at what the Court did on the facts before it, and rejecting an expansive view of certain general statements not essential to the decision, we conclude that the *Gates* opinion deals principally with what corroboration of an informant's tip, not adequate by itself, will be sufficient to meet probable cause standards. The Court granted that the affidavit in the *Gates* case "might well not permit a sufficiently clear inference regarding the [anonymous informant's] 'basis of knowledge'" (*Illinois* v. *Gates, supra* at 246), but concluded that corroboration of details in the tip, including prediction of the defendants' future conduct, was sufficient to warrant a finding of probable cause. In this respect, the Court's treatment of the information disclosed was similar to the treatment of the informant's information in *Draper* v. *United States,* 358 U.S. 307 (1959), where the accurate prediction of the defendant's future, seemingly innocent conduct provided a substantial basis for crediting the informant's hearsay information.[5]

We do not view the *Gates* opinion as decreeing a standardless "totality of the circumstances" test. The informant's veracity and the basis of his knowledge are still important but, where the tip is adequately corroborated, they are not elements indispensable to a finding of probable cause. It seems that, in a given case, the corroboration may be so strong as to satisfy probable cause in the absence of any other showing of the informant's "veracity" and any direct statement of the "basis of [his] knowledge." We shall analyze the affidavit in support of the application for a warrant to search the defendant's premises in light of our view of the *Gates* opinion, mindful that we should not have a "grudging or negative attitude . . . towards warrants" (*United States* v. *Ventresca,* 380 U.S. 102, 108 [1965]), that we should pay

---

[5] In neither the *Gates* nor the *Draper* case was the basis of the informant's knowledge of criminal conduct shown. The *Draper* case involved a known, reliable informant and a warrantless search.

great deference to the magistrate's determination of probable cause (*Spinelli* v. *United States*, 393 U.S. 410, 419 [1969]), and that a "practical, common-sense judgment [is] called for in making a probable-cause determination" (*Illinois* v. *Gates, supra* at 244).

Prior to the *Gates* opinion, we might have been inclined to go directly to the veracity test and to pass by the question whether the informant's statements adequately show underlying circumstances from which she concluded that the evidence being sought was in the motor home. But the *Gates* opinion teaches us that a strong showing as to one element of an informant's tip may compensate for a deficiency as to the other. *Illinois* v. *Gates, supra* at 238-239. Thus we discuss the affidavit as to the informant's "basis of knowledge."

The basis of the informant's knowledge that stolen property was in the defendant's motor home is not forcefully apparent in the affidavit. She said that there was stolen property in the motor home and described it generically. Although she said that she had seen the stolen property, she did not say that she had seen it in the motor home or where or when she had seen it. From her statement that the defendant was planning to move the motor home because Kelleher's motel room had been raided, one may reasonably infer that she believed the stolen property was then in the motor home. But we do not know why she believed the property was there — from hunch, from personal observation, or from information from some undisclosed third party. The "basis of knowledge" element might qualify for a passing mark from a benevolent grader, but the strength of this element is not sufficient to bolster deficiencies in the affidavit in other relevant aspects.[6]

We turn then to the veracity element, the question whether the information given was likely to be accurate. None of the common bases for determining the credibility of an informant or the reliability of her information is present here.

---

[6] We see no significant support for basing a "basis of knowledge" test on the informant's unconfirmed statement that she had been the defendant's girl friend and Lieutenant Beland's unconfirmed guess as to who she was.

The affidavit does not assert that the informant should be believed on the basis of her past performance as a credible informant. See *McCray* v. *Illinois*, 386 U.S. 300, 303-304 (1967); *Commonwealth* v. *Vynorius*, 369 Mass. 17, 21 (1975). Nor does the affidavit show that the informant was credible or her information reliable because she made a statement against her penal interest, such as admitting participation in a crime. See *United States* v. *Harris*, 403 U.S. 573, 583 (1971) (plurality opinion); *Commonwealth* v. *Vynorius*, *supra*. Cf. *Commonwealth* v. *Alessio*, 377 Mass. 76, 82 (1979) (no substantial weight given to incriminating statements of an. anonymous informer). Nor was the informant "an ordinary citizen" who provided information as a witness to a crime. See *Commonwealth* v. *Bowden*, 379 Mass. 472, 477 (1980).

The informant's tip disclosed no other basis for reasonably concluding that she was credible or her information reliable. She was an anonymous informant, and her unverified assent to the suggestion that she was Lynn Alberico does not take her out of that category.[7] Her concern, first expressed, that the defendant would kill her if he knew of her telephone call, casts doubt on the veracity of her admission as to who she was. A statement by a known informant who gave information placing herself in personal danger would have had far greater inherent reliability. Lieutenant Beland did not state that he recognized the voice. She declined to give her address or telephone number. Her adoption of the suggestion that she was Alberico could easily have been a convenient cover for her true identity.

Our inquiry does not cease, however, when the credibility of an informant or the reliability of her information is not shown by her past actions or by her statement itself. An in-

---

[7] In its original brief and again during the course of oral argument, the Commonwealth acknowledged that the informant was an unknown person. The magistrate could not have reasonably concluded otherwise. If Lieutenant Beland had known who the caller was, he would have said so in his affidavit and would not have referred to the caller as "an unidentified female."

formant's tip may be corroborated, and thus made trust-
worthy, by other information presented in the affidavit. See
*Illinois* v. *Gates, supra* at 237-238; *Spinelli* v. *United States*,
393 U.S. 410, 415-418 (1969); *Commonwealth* v. *Kaufman*,
381 Mass. 301, 303 (1980); *Commonwealth* v. *Genest*, 371
Mass. 834, 837-838 (1977). The corroboration must be
"weighty enough to establish reflexively" that the informant
was trustworthy or that the assertions of criminal activity
were well buttressed. *Commonwealth* v. *Kaufman, supra.*
See *Draper* v. *United States*, 358 U.S. 307, 312-313 (1959)
(warrantless arrest and search). Thus the corroboration of
major parts of the informant's information in the *Gates* case
warranted the magistrate's probable cause determination
by providing a substantial basis for crediting the hearsay.
See *Illinois* v. *Gates, supra* at 243-246. Corroboration of in-
nocent details will normally be less significant in estab-
lishing probable cause than corroboration of facts suggestive
of criminal conduct. See *Ker* v. *California*, 374 U.S. 23, 36
(1963); *Commonwealth* v. *Kaufman, supra* at 303 n.2;
*Commonwealth* v. *Alessio*, 377 Mass. 76, 81 (1979); *Com-
monwealth* v. *Stevens*, 362 Mass. 24, 28 (1972); 1 W.
LaFave, Search and Seizure § 3.3, at 557-558 (1978). How-
ever, "the degree of suspicion that attaches to particular
types of noncriminal acts" is said to be more significant than
whether the particular conduct was "innocent" or "guilty."
*Illinois* v. *Gates, supra* at 243 n.13. A tip, intrinsically in-
sufficient and insufficiently corroborated, may nevertheless
be considered in the total picture and may contribute toward
satisfying a magistrate as to probable cause. *Common-
wealth* v. *Kaufman, supra* at 303. See *Spinelli* v. *United
States, supra* at 418; *Commonwealth* v. *Boswell*, 374 Mass.
263, 268 (1978).

The affidavit did contain some corroboration of the in-
formant's information. She was correct in stating that Kel-
leher's motel room had been "raided." This information
was timely. It may reasonably be inferred that certain
property stolen in recent housebreaks had not been recov-
ered in Kelleher's motel room. Lieutenant Beland con-

firmed that an apparently movable motor home was parked at 5 Jefferson Avenue, the defendant's premises. The informant also seemed to know that Lynn Alberico had been a girl friend of the defendant, a fact Beland could confirm from his own knowledge. No other fact stated by the informant was corroborated. The affidavit contained no independent information in support of the issuance of the search warrant, such as a police investigation showing that stolen property was probably in the motor home or that there was a link between the Kelleher motel room and the defendant.[8]

We conclude that the limited police corroboration of the informant's statements set forth in the affidavit and the informant's statements themselves did not warrant a finding of probable cause. The fact that the defendant had had a girl friend named Alberico added almost nothing to bolster the trustworthiness of the informant's statements. The presence of the motor home at 5 Jefferson Avenue was confirmed, but that fact related to innocent, nonsuspicious conduct. The mere confirmation, as would be true in every case, that a place to be searched in fact exists does little to credit other facts an informant discloses. Finally, the reliability of the informant's tip cannot be inferred solely from the fact that she knew that the police had raided a third person's motel room. Our cases upholding the reliability of an anonymous informant's tip have involved more substantial corroboration than that shown in this case. See *Commonwealth* v. *Alessio*, 377 Mass. 76, 80-82 (1979); *Commonwealth* v. *Genest*, 371 Mass. 834, 837-838 (1980); *Commonwealth* v. *Avery*, 365 Mass. 59, 62-64 (1974) (warrantless arrest); *Commonwealth* v. *Anderson*, 362 Mass. 74, 76-77 (1972). The facts corroborated in the *Gates* case are far

---

[8] The affidavit would have been measurably aided if it had stated, as was the fact, that a wallet containing identification of Upton's wife had been found in the motel room. It would have been somewhat strengthened by a reference, as was the fact, to knowledge of Upton's prior conviction for receiving stolen property, and possibly by a reference to his reputation as a "fence" dealing in stolen property. See *Commonwealth* v. *Kaufman, supra* at 304 n.4; 1 W. LaFave, Search and Seizure § 3.2, at 470-475 (1978).

more extensive and significant than the facts corroborated in this case. The tip in the *Gates* case involving the defendant's suspicious conduct, specifically detailed, was "corroborated in major part" by police investigation. See *Illinois* v. *Gates, supra* at 243. No arguably suspicious conduct of the defendant in this case was corroborated. Indeed, the informant gave little specific detail at all.

If the affidavit in the case before us were to be upheld, the Fourth Amendment would be weakened to the level of permitting the search of any person's premises based on a telephone tip from an anonymous informer who told a story connecting those premises with the fact of a recent police search of a third person's room on premises to which the public had access. Until advised to the contrary, we believe the *Gates* opinion should not be read as permitting such a radical result. The motions to suppress should have been allowed.[9]

Because we conclude that the evidence seized pursuant to the search warrant should have been suppressed by application of Fourth Amendment principles expressed by the Supreme Court of the United States, particularly and most recently in *Illinois* v. *Gates,* we need not consider whether the search violated the cognate provisions of art. 14 of the Massachusetts Declaration of Rights or, if it did, in what circumstances, if any, we would conclude that that evidence must be excluded as a matter of State law.

Clear lines defining constitutionally permissible conduct are most desirable to guide the police, magistrates, prosecutors, defense counsel, and judges. If we have correctly construed the significance of *Illinois* v. *Gates,* the Fourth Amendment standards for determining probable cause to issue a search warrant have not been made *so much less* clear and so relaxed as to compel us to try our hand at a definition of standards under art. 14. If we have misassessed

---

[9] The Commonwealth has not argued that the exclusionary rule should not apply here because the police acted reasonably and in good faith pursuant to a warrant issued by a magistrate, an issue the Supreme Court declined to consider in the *Gates* case. *Illinois* v. *Gates, supra* at 217-224.

the consequences of the *Gates* opinion and in fact the *Gates* standard proves to be unacceptably shapeless and permissive, this court may have to define the protections guaranteed to the people against unreasonable searches and seizures by art. 14, and the consequences of the violation of those protections.[10]

2. The Commonwealth argues that, if the search warrant was defective, the search was based on probable cause and could properly have been conducted without a search warrant because there were exigent circumstances justifying prompt action. Even if a warrant is invalid, a search might be justified as a warrantless search. See *Commonwealth* v. *White*, 374 Mass. 132, 140 (1977), aff'd by an equally divided Court, 439 U.S. 280 (1978).

There is a possibility that there was probable cause to search based on additional information not set forth in the affidavit in support of the search warrant. The police officer at the site noticed the defendant and his brother removing items from the motor home and taking them to the house. He also saw thick smoke coming out of a chimney although it was not a cold day. See n.8 above for additional information bearing on probable cause not disclosed in the affidavit. Even if there was probable cause to search, the search was a general search, purportedly pursuant to the warrant, producing items not in plain view. It is questionable whether such a general search could be justified as a warrantless search. See *Commonwealth* v. *Young*, 382 Mass. 448, 460-461 (1981). Moreover, it is doubtful that there were exigent circumstances requiring immediate action. The standards as to exigency are strict, and the Commonwealth had the burden of proof. See *Commonwealth* v. *Huffman*, 385 Mass. 122, 124-125 (1982). From their testimony, the police who were on the scene while the war-

---

[10] Our invitation for further briefs following the release of the *Gates* opinion (see n.4 above) raised the possibility of the applicability of State law other than constitutional requirements. We need not decide here whether the warrant requirements of G. L. c. 276, § 2B, impose a stricter standard for the issuance of a search warrant than the Fourth Amendment or art. 14.

rant was being sought appear not to have reacted to the smoke as if it created an emergency. They waited for the search warrant. The Commonwealth did not advance the argument that there were exigent circumstances in either of its memoranda filed with the motion judges. Because this contention was not presented to the motion judges, the argument comes too late. See *Commonwealth* v. *Scala*, 380 Mass. 500, 510 (1980). The necessary factual determinations concerning exigency were not made and should have been sought when the motions were considered. Nor, as far as appears, was the defendant given warning that the Commonwealth was relying on exigent circumstances to justify the search. If the defendant had had notice of this contention, he might have offered evidence tending to show that there was no emergency.

3. Although the motions to suppress the evidence seized at the defendant's home should have been allowed and, therefore, that evidence will not be admissible at any retrial of the defendant, there was other evidence to support the defendant's conviction on at least some of the charges against him. Therefore, we consider an issue that may arise if the defendant is to be tried again.

The defendant challenged the denial of a judicial grant of use immunity to one James Ellis who, it was argued, would contradict the testimony of Richard Kelleher incriminating the defendant. Kelleher was an important Commonwealth witness. He testified that the defendant drove Ellis and him to certain houses which they broke into at the defendant's direction, while the defendant served as a lookout. Kelleher also testified that he had sold stolen property to the defendant. Kelleher's testimony tended to show that he and the defendant had been engaged during the summer and fall of 1980 in numerous housebreaks.

In the course of the trial, and after the Commonwealth had rested, the defendant moved that the judge grant use immunity to Ellis. The judge held a voir dire on that motion. He heard testimony from Ellis, who was represented by counsel. Ellis described the circumstances that led him

to appear at the trial at the defendant's request. He said that he wanted to give his version of what happened concerning certain housebreaks and stolen property. However, he declined to testify about particular events, relying on his right against self-incrimination under the Fifth Amendment. He did not refer to his right, stated in art. 12 of the Massachusetts Declaration of Rights, not to be compelled to furnish evidence against himself. He testified that he had talked to an investigator for the defendant before the trial began and told him "what [his] position was in the case."

Defense counsel made an offer of proof concerning Ellis's anticipated testimony. He would have testified that he engaged in certain housebreaks with Kelleher, that Kelleher did not want him to know with whom he was dealing in disposing of the stolen property, and that the defendant did not drive them to the houses they broke into. Ellis would also have testified that he had no contact with the defendant prior to or after the housebreaks. The judge denied the motion in the exercise of his discretion.[11]

We recently rejected the claim of defendants that they had a constitutional right to have a prospective defense witness immunized. *Commonwealth* v. *Curtis*, 388 Mass. 637, 643-645 (1983). We recognized that the Federal courts have generally rejected such claims under the Constitution of the United States. *Id.* at 644-645. See *United States* v. *Thevis*, 665 F.2d 616, 639 (5th Cir.), cert. denied, 459 U.S. 825 (1982). See also *United States* v. *Bounos*, 693 F.2d 38, 39 (7th Cir. 1982) ("no such animal as judicial immunity" exists); *United States* v. *Hunter*, 672 F.2d 815, 818 (10th Cir. 1982) (courts have no power independently to fashion witness use immunity under the guise of due process). The Court of Appeals for the First Circuit has left open the question when, if ever, due process may require immunization

---

[11] The judge's denial of the motion could be justified on the ground that it came too late as to a potential witness known to the defense's investigator before trial to whom Ellis had stated "[his] position" as to the case. That ground for denial of such a motion presumably will not be available in connection with any retrial.

of defense witnesses. *United States* v. *Flaherty,* 668 F.2d 566, 582-583 & n.6 (1st Cir. 1981). The Court of Appeals for the Second Circuit would foreclose all inquiry into the question of immunity if the prospective witness is an actual or potential target of prosecution. See *United States* v. *Turkish,* 623 F.2d 769, 778 (2d Cir. 1980), cert. denied, 449 U.S. 1077 (1981). This was essentially the view we expressed in the *Curtis* case, barring "some unique circumstances." *Commonwealth* v. *Curtis, supra* at 645-646.

In passing on a request for immunity, if the prospective witness relies on his right not to incriminate himself expressed in art. 12 of the Declaration of Rights, consideration might have to be given to the requirement under the Constitution of the Commonwealth that a grant of immunity must be a grant of transactional, and not merely use, immunity. *Attorney Gen.* v. *Colleton,* 387 Mass. 790, 795-797 (1982). *Emery's Case,* 107 Mass. 172, 185 (1871). The situation is different under the Fifth Amendment to the Constitution of the United States, where a grant of immunity to a witness is constitutionally adequate if it proscribes the use in a subsequent criminal case against the witness of the compelled testimony and any evidence directly or indirectly derived from that compelled testimony. *Kastigar* v. *United States,* 406 U.S. 441, 453 (1972). This difference may be significant in weighing the government's legitimate interests in whether immunity should be granted.

On the record in this case, a judicial grant of use immunity to Ellis was not required under constitutional principles. We decline to speculate on what arguments on the immunity question the defendant may present if the defendant is to be retried. We would expect that any claim for immunization of Ellis would be advanced and heard sufficiently before trial so that a timely decision could be made.

4. The judgments are reversed and the verdicts set aside. The orders denying the defendant's motions to suppress evidence seized at his residence are also vacated. Orders shall be entered allowing those motions to suppress. The case is remanded to the Superior Court.

*So ordered.*

LYNCH, J. (dissenting, with whom Nolan, J., joins). In its opinion, the majority reduces the United States Supreme Court's recent decision in *Illinois* v. *Gates*, 462 U.S. 213 (1983), to a mere elaboration upon the "two-pronged test" of *Aguilar* v. *Texas*, 378 U.S. 108 (1964), and *Spinelli* v. *United States*, 393 U.S. 410 (1969), despite the clearly articulated judgment of the Court "that it is wiser to abandon the [*Aguilar/Spinelli* test]". *Illinois* v. *Gates, supra* at 238. I dissent from that portion of the opinion. As the majority views it, "the *Gates* opinion deals principally with what corroboration of an informant's tip, not adequate by itself, will be sufficient to meet probable cause standards." *Supra* 568. Significantly, the majority persists in making the initial decision as to the adequacy of a tip according to the specific legal tests of *Aguilar* and *Spinelli,* which stipulate that an affidavit must present: "(1) some of the underlying circumstances from which the informant concluded that the contraband was where he claimed it was (the basis of knowledge test), and (2) some of the underlying circumstances from which the affiant concluded that the informant was 'credible' or his information 'reliable' (the veracity test)." *Supra* at 566. The majority seeks to address recurrent criticisms of this test, that such a precise set of legal rules is as ill-suited to the police officer in the field as it is to the magistrate trying to assess a complicated fact situation, by the corrective gloss of corroboration: if either "prong" of the test is dealt with inadequately in the affidavit, independent corroboration may be used to fill in the gaps. Hence a technical exception is carved out of the technical legal standards of *Aguilar* and *Spinelli*.

I believe that *Illinois* v. *Gates, supra,* properly read, means more than this. At its foundation, the majority opinion in *Gates* derives from the observation that "probable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 232. This recognition of the difficulty of fashioning uniform legal criteria applicable to diverse factual situations in

the search-and-seizure context is reflected in the adoption by the United States Supreme Court of a "totality-of-the-circumstances" standard, "which permits a balanced assessment of the relative weights of *all* the various indicia of reliability (and unreliability) attending an informant's tip (emphasis added)." *Id.* at 234.

The most important aspect of this new standard is a shift in emphasis from the reviewing court to the magistrate. If the latter has a "substantial basis" for finding the existence of probable cause to search, this is enough: "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review." *Illinois* v. *Gates, supra* at 236. I submit that this new orientation toward the "practical, commonsense decision" of a magistrate represents a significant change from the previous emphasis placed on compliance with the rules set forth in *Aguilar* and *Spinelli*. *Id.* at 238. The change is for the better; the determination of probable cause, whether by a police officer or a magistrate, should be governed by "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Illinois* v. *Gates, supra* at 231, quoting *Brinegar* v. *United States,* 338 U.S. 160, 175 (1949).

In the instant case, faithful application of the "totality of the circumstances" standard announced by *Gates,* rather than a "two-pronged test" adjusted by a corroboration feature, would have upheld the magistrate's finding of probable cause to issue a warrant. An unannounced search of the motel room of one Kelleher yields property stolen in recent local robberies. Three hours later, a telephone call is received. The caller, whose identity is admittedly unknown, reveals knowledge of the motel search, links the defendant to the search by saying that more stolen items (which are identified and correspond to objects taken in the robberies) which the defendant bought from Kelleher are located in the defendant's mobile home, and communicates the exigency of these circumstances by informing the police that the defendant knows of the motel room search and is plan-

ning to move the stolen items. Whether or not the caller actually is Lynn Alberico, the caller is close enough to the defendant to know his girl friend's name and his address, and to have been inside the defendant's mobile home and to have actually seen the "stolen stuff." The informant appears credible. The location of the mobile home is verified, an explanation is provided for the abrupt and incomplete nature of the information provided (the caller fears retaliation), this explanation also supplies a motive (revenge), and, most importantly, the timing of the call is too close to the search of the motel room to be a mere fortuity. All of this information was provided in the affidavit.

I agree with the majority that if the affidavit had included additional facts that were known to the police, it "would have been measurably aided." *Supra* at note 8. However, I believe that the "totality-of-the-circumstances" standard announced by *Gates* was tailor-made for circumstances such as these. Judging the affidavit solely on its face, "there [was] a fair probability that contraband or evidence of a crime [would] be found" in the mobile home. See *Illinois* v. *Gates, supra* at 238.

I see no conflict between this interpretation of the mandate of *Gates,* which simply involves taking the decision at face value, and either art. 14 of the Massachusetts Declaration of Rights or G. L. c. 276, § 2B. The language of the Fourth Amendment to the United States Constitution has been commonly thought of as paralleling that of art. 14, and indeed the structure of the latter has been viewed as occupying an important role in the drafting of the Fourth Amendment. *Harris* v. *United States,* 331 U.S. 145, 158 (1947) (Frankfurter, J., dissenting). See *Commonwealth* v. *Cundriff,* 382 Mass. 137, 144 n.11 (1980), cert. denied, 451 U.S. 973 (1981); *Commonwealth* v. *Wilkins,* 243 Mass. 356, 360 (1923). There appears to be no logical basis, and no support in the case law, for interpreting the term "cause" in art. 14 differently from the "probable cause" requirement of the Fourth Amendment.[1]  I also find no support for the

---

[1] It is true that on various occasions we have acknowledged that art. 14 could conceivably be applied to searches more strictly than the Fourth

defendant's argument that the "two-pronged" test of *Aguilar* and *Spinelli* is "engrafted" into art. 14.

I similarly find no merit in the defendant's contention that G. L. c. 276, § 2B, as amended by St. 1965, c. 384, should be read to require application of the "two-pronged test." The operative language of § 2B instead implies just the opposite, namely that determination of the sufficiency of an affidavit should be based on a totality of the circumstances analysis: "[An] affidavit shall contain the facts, information, and circumstances upon which [the person seeking a search warrant] relies to establish sufficient grounds for the issuance of the warrant." The recommended form of an affidavit, which is delineated in the statute, contains a listing of the elements to be contained in the document, and the list does include information relating to the basis of knowledge and reliability of the information source. The inclusion of these factors in the probable cause determination is again consistent with the *Gates* decision, which emphasized that while establishing these two "prongs" might not be telling in every case, their existence certainly "illuminate[s] the commonsense, practical question" of probable cause facing a magistrate. *Illinois* v. *Gates, supra* at 230. The language of G. L. c. 276, § 2B, in no way suggests, however, that establishing both "prongs" of *Aguilar* and *Spinelli* is a necessary precondition for the adequacy of an

Amendment; however, this hypothetical situation has not yet arisen. *Commonwealth* v. *Ortiz*, 376 Mass. 349, 358 (1978). *Commonwealth* v. *Nine Hundred and Ninety-two Dollars*, 383 Mass. 764, 770-771 (1981). *Commonwealth* v. *Sheppard*, 387 Mass. 488, 508 & n.22 (1982), cert. granted, 463 U.S. 1205 (1983). Cf. *Selectmen of Framingham* v. *Municipal Court of the City of Boston*, 373 Mass. 783, 786-788 (1977) (violation found of both State and Federal Constitution). Although other provisions of the Massachusetts Constitution have been interpreted to afford greater protection than the United States Constitution in a limited number of areas, each area has been characterized by a significant divergence between the language and construction of the respective Federal and State provisions. *Commonwealth* v. *Soares*, 377 Mass. 461, cert. denied, 444 U.S. 881 (1979) (jury selection). *District Attorney for the Suffolk Dist.* v. *Watson*, 381 Mass. 648 (1980) (death penalty). *Moe* v. *Secretary of Admin. & Fin.*, 382 Mass. 629 (1981) (abortion).

affidavit. The defendant's assertion that the statute reflects the approach of *Aguilar* and *Spinelli* appears even less likely when one considers that § 2B was signed into law on June 16, 1964, St. 1964, c. 557, and *Aguilar* v. *Texas, supra,* was decided on June 15, 1964, one day earlier. *Spinelli* v. *United States, supra,* in turn, was decided five years later.

Guided by the "totality of the circumstances" analysis adopted by the United States Supreme Court's decision in *Illinois* v. *Gates,* 462 U.S. 213 (1983), I would hold that the magistrate had a substantial basis for concluding that probable cause existed for the search of the defendant's mobile home.