**UNITED STATES of America**

v.

**Glenston P. LAWS, Appellant.**

**No. 82–1679.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 2, 1982.

Decided Dec. 9, 1986.

Michael S. Frisch, Washington, D.C., appointed by this Court, for appellant.

David E. Sellinger, Asst. U.S. Atty., with whom Stanley S. Harris, U.S. Atty. at the time the brief was filed, and Michael W. Farrell and C. Madison Brewer, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before ROBINSON, MIKVA and SCALIA,* Circuit Judges.

---

* Judge (now Justice) Scalia was a member of the panel at the time this case was argued, but did not participate in this opinion.

Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Once again we are called upon to assess the constitutional sufficiency of affidavits to support the issuance of a search warrant. The instant appeal is from convictions following denial of a motion to suppress evidence seized pursuant to the warrant. Analyzing the affidavits in light of the applicable case-law, we hold that they pass constitutional muster, and consequently that the evidence was properly admitted at trial. We accordingly affirm the convictions.

## I. BACKGROUND

Officer William E. Larman, of the Metropolitan Police Department's Narcotics Branch, executed search warrants in two rooms at a Holiday Inn in northeast Washington, D.C. Cocaine and related paraphernalia found in one of the rooms led to the arrest and indictment of Glenston P. Laws, the appellant, who was registered as the occupant of that room. Laws moved to suppress the use of this evidence on the ground that two affidavits purporting to underpin the warrants failed to establish probable cause, and consequently that the search violated the Fourth Amendment.[1] The motion was denied and, at a trial on stipulated facts, Laws was convicted of possession of cocaine with intent to distribute[2] and possession of narcotics paraphernalia.[3]

On appeal, Laws challenges only the sufficiency of the affidavits, insisting that probable cause was not shown. He claims that informants' tips which the affidavits incorporated were unreliable, and that the information communicated by the affidavits was stale and lacking in specificity. We address these contentions in turn.

## II. TESTING INFORMATION SUPPLIED BY UNIDENTIFIED INFORMANTS

To demonstrate probable cause to search premises, an affidavit must set forth facts sufficient to induce a reasonably prudent person to believe that a search thereof will uncover evidence of a crime.[4] An affidavit predicated upon an informant's tip has been regarded as vulnerable because the tip is hearsay,[5] which, like all hearsay, is susceptible to special concerns of perception and veracity.[6] If the tip is to serve as a basis for a finding of probable cause, the

1. "The right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "A hotel room can clearly be the object of Fourth Amendment protection as much as a home or an office." *Hoffa v. United States*, 385 U.S. 293, 301, 87 S.Ct. 408, 413, 17 L.Ed.2d 374, 381 (1966) (citing *United States v. Jeffers*, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951)).

2. In violation of 21 U.S.C. § 841(a) (1982).

3. In violation of D.C.Code Ann. § 22-3601 (1981).

4. *Berger v. New York*, 388 U.S. 41, 55, 87 S.Ct. 1873, 1881, 18 L.Ed.2d 1040, 1050 (1967); *Grau v. United States*, 287 U.S. 124, 128, 53 S.Ct. 38, 40, 77 L.Ed. 212, 215 (1932); *Dumbra v. United States*, 268 U.S. 435, 439, 45 S.Ct. 546, 548, 69 L.Ed. 1032, 1035 (1925); *United States v. Melancon*, 462 F.2d 82, 89 (5th Cir.), *cert. denied*, 409 U.S. 1038, 93 S.Ct. 516, 34 L.Ed.2d 487 (1972); *United States v. Rich*, 407 F.2d 934, 936 (5th Cir.), *cert. denied*, 395 U.S. 922, 89 S.Ct. 1775, 23 L.Ed.2d 239 (1969); *United States v. Lucarz*, 430 F.2d 1051, 1055 (9th Cir.1970).

5. See *Jones v. United States*, 362 U.S. 257, 269–271, 80 S.Ct. 725, 735, 4 L.Ed.2d 697, 707 (1960). To be contrasted is a warrant issued on an affidavit averring that the affiant witnessed, heard, or otherwise perceived the activity reported.

6. This does not mean that the validity of affidavits for Fourth Amendment purposes is to be judged by the standards governing admissibility at trial of statements excepted from operation of the hearsay rule. See *Draper v. United States*, 358 U.S. 307, 311–312, 79 S.Ct. 329, 332, 3 L.Ed.2d 327, 331 (1959); see also *Spinelli v. United States*, 393 U.S. 410, 425, 89 S.Ct. 584, 593, 21 L.Ed.2d 637, 649 (1969) (concurring opinion).

"neutral and detached magistrate"[7] issuing the warrant must have substantial reason to believe that nonetheless the hearsay is reliable.[8] Without that determination, the magistrate would cede his duty to gauge probable cause to the informant and the possibly overzealous law-enforcement officer.[9]

The Supreme Court has not left this constitutionally-required evaluation unguided. In the 1960's, in *Aguilar v. Texas*[10] and *Spinelli v. United States*,[11] the Court outlined inquiries to be made by an issuing magistrate in ascertaining whether a tip has overcome the presumed untrustworthiness of hearsay. The Court's more recent decisions, particularly *Illinois v. Gates*,[12] have substantially recast the probable cause analysis appropriate in this area.

## A. The Aguilar-Spinelli *Two-Pronged Test*

In *Aguilar*, a drug prosecution, the Court ruled that a tip-based warrant could not survive Fourth Amendment scrutiny without judicial consideration of the hearsay problems of perception and veracity.[13]

Speaking to the first concern, the Court held that "the magistrate must be informed of some of the underlying circumstances from which the informant concluded that narcotics were where he claimed they were."[14] This requirement, aptly termed the "basis of knowledge,"[15] called for some description of the informant's means of perception: Did he see, hear, touch or smell the criminal activity or contraband? As for the second concern—veracity—the Court held that the affiant must also present to the magistrate information shoring up the conclusion "that the informant, whose identity need not be disclosed, ... was credible, or his information reliable."[16] The *Aguilar* affidavit, which stated only that the affiants had "received reliable information from a credible person" and "believed that narcotics ... [were] being kept at the [designated] premises,"[17] failed in both respects.[18]

In *Spinelli*, the Court addressed the question whether corroborative information gathered by police could cure a tip that failed to meet *Aguilar*'s double demand.[19]

---

7. See *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436, 440 (1948).

8. *Aguilar v. Texas*, 378 U.S. 108, 114–115, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723, 729 (1964); *Jones v. United States, supra* note 5, 362 U.S. at 269, 80 S.Ct. at 735, 4 L.Ed.2d at 707.

9. *Aguilar v. Texas, supra* note 8, 378 U.S. at 114–115, 84 S.Ct. at 1514, 12 L.Ed.2d at 729; *Johnson v. United States, supra* note 7, 333 U.S. at 14, 68 S.Ct. at 369, 92 L.Ed. at 440.

10. *Supra* note 8.

11. *Supra* note 6.

12. 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Since the warrant at issue predates *Gates,* we invited and received supplemental briefs on the applicability of *Gates,* and we think that decision governs review of the probable-cause determination here. See *United States v. Mendoza*, 727 F.2d 448, 450 (5th Cir.1984); cf. *United States v. Ross*, 456 U.S. 798, 824 n. 33, 102 S.Ct. 2157, 2172 n. 33, 72 L.Ed.2d 572, 593 n. 33 (1982) (in response to a claim that a more restrictive reading of the Fourth Amendment should not be given retroactive effect, the Court declared that "[a]ny interest in maintaining the status quo that might be asserted by persons who may have structured their business of dis-

tributing narcotics or other illicit substances on the basis of judicial precedents clearly would not be legitimate"). At any rate, our outcome on this appeal would be the same even if the rules shaping our decision were properly to be derived from the pre-*Gates* precedents.

13. 378 U.S. at 114, 84 S.Ct. at 1514, 12 L.Ed.2d at 729.

14. *Id.*

15. See *Stanley v. State*, 19 Md.App. 507, 313 A.2d 847, 851 (1974); LaFave, *Probable Cause From Informants: The Effects of Murphy's Law on Fourth Amendment Adjudication*, 1977 U.Ill. L.F. 1, 4.

16. *Aguilar v. Texas, supra* note 8, 378 U.S. at 114, 84 S.Ct. at 1514, 12 L.Ed.2d at 729 (footnote omitted).

17. *Id.* at 109, 84 S.Ct. at 1511, 12 L.Ed.2d at 725.

18. *Id.* at 113–114, 84 S.Ct. at 1513–1514, 12 L.Ed.2d at 728–729.

19. In *Spinelli v. United States, supra* note 11, the challenged affidavit reported that a "confidential, reliable" informant tipped off the police that "William Spinelli is operating a handbook

The Court ruled that while supplemental information could possibly vitalize a deficient tip,[20] it did not do so in *Spinelli*. The effort to corroborate yielded nothing explaining how the informant came by his information or otherwise elevating the tip above a "casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation,"[21] nor did it cast an "aura of suspicion" over otherwise innocent behavior.[22] Later cases applied the two-pronged test of *Aguilar* and *Spinelli*, weighing and sometimes debating the significance of particular circumstances to the demands for perception and veracity.[23]

## B. *The* Gates *Totality-of-the-Circumstances Test*

Recently, in *Illinois v. Gates*,[24] the Court abandoned a strict, mechanical adherence to the two-pronged *Aguilar-Spinelli* test of informant reliability, and eliminated the need to satisfy distinctly and fully the test's double demands.[25] *Gates* held that an informant's basis of knowledge and his or her veracity should not be understood as "entirely separate and independent requirements to be rigidly exacted in every case."[26] Rather, these two elements are to be taken only as "relevant considerations in the totality of circumstances analysis that traditionally has guided probable cause determinations."[27] The Court elucidated:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair

and accepting wagers and disseminating wagering information by means of the telephones which had been assigned the numbers WYdown 4–0029 and WYdown 4–0136." 393 U.S. at 414, 89 S.Ct. at 588, 21 L.Ed.2d at 642. The corroborative information included a report on surveillance of Spinelli's frequent trips across the state line and visits to an apartment house in which were telephones having the numbers given by the informant. *Id.*

**20.** *Id.* at 415, 89 S.Ct. at 588, 21 L.Ed.2d at 643.

**21.** *Id.* at 416, 89 S.Ct. at 589, 21 L.Ed.2d at 644.

**22.** *Id.* at 418, 89 S.Ct. at 590, 21 L.Ed.2d at 645.

**23.** For example, a plurality of the Supreme Court accepted, as inherently plausible in the *Aguilar* sense, a declaration against the penal interest of the informant. *United States v. Harris*, 403 U.S. 573, 583–584, 91 S.Ct. 2075, 2082, 29 L.Ed.2d 723, 733–734 (1971) (plurality opinion); see also *United States v. Davis*, 199 U.S. App.D.C. 95, 111, 617 F.2d 677, 693 (1979). The dissenters in *Harris* noted the "tenuous" analogy to the hearsay exception for such declarations, stating that "where the declarant is a police informant it seems at least as plausible to assume ... that the declarant-confidant at least believed he would receive absolution from prosecution for his confessed crime in return for his statement." 403 U.S. at 494–495, 91 S.Ct. at 2087, 29 L.Ed.2d at 740 (dissenting opinion). In line with the *Harris* plurality, this court had occasion to remark that "'one who knows the police are already in the position to charge him would not undertake to divert the police down a blind alley.'" *United States v. Davis, supra*, 199 U.S.App.D.C. at 111, 617 F.2d at 692 (quoting 1

W. LaFave, Search and Seizure § 3.3, at 528 (1978)).

An example of a showing deemed sufficient on the basis-of-knowledge prong was self-verifying detail. If the informant described persons or activities minutely, it was held that the tip likely emanated from first-hand observations. See, e.g., *United States v. Myers*, 176 U.S.App. D.C. 76, 78, 538 F.2d 424, 426 (1976), *cert. denied*, 430 U.S. 908, 97 S.Ct. 1179, 51 L.Ed.2d 584 (1977); *United States v. Spach*, 518 F.2d 866, 868–869 (7th Cir.1975). See also discussion in *LaFave, supra* note 15. Courts utilizing this approach took their cue from a pre-*Aguilar* case, *Draper v. United States, supra* note 6.

**24.** *Supra* note 12.

**25.** 462 U.S. at 238–239, 103 S.Ct. at 2332, 76 L.Ed.2d at 548.

**26.** [A]n informant's "veracity," "reliability" and "basis of knowledge" are all highly relevant in determining the value of his report. We do not agree, however, that these elements should be understood as entirely separate and independent requirements to be rigidly exacted in every case.... Rather, ... they should be understood simply as closely intertwined issues that may usefully illuminate the common-sense, practical question whether there is "probable cause" to believe that contraband or evidence is located in a particular place.
*Id.* at 230, 103 S.Ct. at 2328, 76 L.Ed.2d at 543 (footnote omitted).

**27.** *Id.* at 230, 103 S.Ct. at 2328, 76 L.Ed.2d at 543.

probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... concluding" that probable cause existed.[28]

The Court deemed the totality-of-circumstances standard better suited to the practical task of gauging probable cause, which "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."[29]

The *Gates* Court also emphasized the importance of independent police work corroborating the details of an informant's tip.[30] This sort of confirmation may bolster the reliability of the hearsay, and thus increase the likelihood of demonstrating probable cause; in particular cases, it could even be decisive: "It is enough, for purposes of assessing probable cause, that 'corroboration through other sources of information reduce[d] the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.' "[31] The Court observed that its decisions utilizing a totality-of-circumstances analysis have consistently acknowledged the value of police corroboration in making the probable cause determination.[32]

The *Gates* Court ruled that probable cause was made out by an anonymous letter indicating that a husband-wife team was currently violating state drug laws and planning future criminal activities,[33] as supplemented by information obtained through an independent police investigation.[34] The Court noted that this information suggested that the Gates were involved in drug trafficking,[35] and thus corroborated the

28. *Id.* at 238–239, 103 S.Ct. at 2332, 76 L.Ed.2d at 548 (quoting *Jones v. United States, supra* note 5, 362 U.S. at 271, 80 S.Ct. at 736, 4 L.Ed.2d at 708).

29. *Illinois v. Gates, supra* note 12, 462 U.S. at 243–244 n. 13, 103 S.Ct. at 2335 n. 13, 76 L.Ed.2d at 552 n. 13. " 'In dealing with probable cause ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Id.* at 231, 103 S.Ct. at 2328, 76 L.Ed.2d at 544 (quoting *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879, 1890 (1949)).

30. *Illinois v. Gates, supra* note 12, 462 U.S. at 241–242, 103 S.Ct. at 2334–2335, 76 L.Ed.2d at 551–552.

31. *Id.* at 244–245, 103 S.Ct. at 2335, 76 L.Ed.2d at 551–552 (quoting *Jones v. United States, supra* note 5, 362 U.S. at 271, 80 S.Ct. at 736, 4 L.Ed.2d at 708).

32. *Illinois v. Gates, supra* note 12, 462 U.S. at 241–242, 103 S.Ct. at 2334, 76 L.Ed.2d at 550 (discussing *Jones v. United States, supra* note 6; *Draper v. United States, supra* note 6); see also *United States v. Lucas,* 250 U.S.App.D.C. 264, 267, 778 F.2d 885, 888 (1985); *United States v. Peyko,* 717 F.2d 741, 742 (2d Cir.1983); *United States v. Porter,* 738 F.2d 622, 626 & n. 3 (4th Cir.), *cert. denied,* 469 U.S. 983, 105 S.Ct. 389, 83 L.Ed.2d 323 (1984); *United States v. Settegast,* 755 F.2d 1117, 1122 (5th Cir.1985); *United States v. Arenal,* 768 F.2d 263, 267 (8th Cir. 1985); cf. *United States v. Kolodziej,* 712 F.2d 975, 978–979 (5th Cir.1983) (invalidating warrant based on informant's tip and noting that the tip was not corroborated by police investigation).

33. The letter stated that the Gates couple had over $100,000 worth of drugs concealed in the basement of their home in Bloomingdale, Illinois, and gave a detailed description of the Gates' imminent plan to purchase drugs from a source in Florida. The letter also informed the police that the wife would drive their car to Florida; that the husband would fly to Florida a few days later; and that the car, loaded with drugs, would be driven back to Illinois by the husband soon thereafter. *Illinois v. Gates, supra* note 12, 462 U.S. at 225, 103 S.Ct. at 2325, 76 L.Ed.2d at 540.

34. Acting on the tip, local police made arrangements with federal agents for surveillance of the Gates' activities. Their combined efforts revealed that the husband flew to Florida, stayed overnight in a hotel room registered in his wife's name, and departed the next day, accompanied by a woman, in a car bearing Illinois plates registered in his name. Federal agents saw the couple heading north on an interstate highway toward the area of Bloomingdale, Illinois. *Id.* at 243, 103 S.Ct. at 2334, 76 L.Ed.2d at 551.

35. *Id.* The husband's flight to Florida, a well-known source of illegal drugs, his brief stay in a hotel, and his immediate return to Illinois in the family car were "suggestive of a pre-arranged drug run." *Id.*

anonymous tip in major part.[36] That the informant's reliability was unknown to the police became "far less significant" after their investigation tended to confirm key aspects of the tip,[37] and with this degree of verification it was reasonable to conclude that the affiant was probably correct in his claim of illegal activity by the Gates.[38] The Court acknowledged that the information contained in the affidavit might not satisfy the veracity prong of *Spinelli*, but deemed it sufficient for the "practical, common-sense judgment" summoned by the need to make a probable cause determination.[39]

The *Gates* Court further held that the accuracy of the informant-communicated details of the Gates' forthcoming trip to Florida made it likely that the informant had access to reliable information, including dependable information on illegality.[40]

And while the Court recognized that the letter and the subsequent corroboration might not clearly establish the informant's basis of knowledge, it felt that they did make it sufficiently probable that the informant had obtained his information "from the Gateses or someone they trusted." [41] Given the anonymous letter, the corroborating police investigation, and reasonable inferences, the Court concluded that the magistrate had a substantial basis for making a finding of probable cause.[42]

During the term following the *Gates* decision, the Supreme Court, in *Massachusetts v. Upton*,[43] reiterated its holding that strict adherence to the *Aguilar-Spinelli* two-pronged test was no longer proper. The Massachusetts Supreme Court had found a warrant deficient under *Gates'* totality-of-circumstances test.[44] Interpreting

**36.** *Id.* at 243–244, 103 S.Ct. at 2334–2335, 76 L.Ed.2d at 551–552.

**37.** *Id.* at 244, 103 S.Ct. at 2335, 76 L.Ed.2d at 552. The Court observed that police verification of innocent activity reported in a tip may also confirm the probable existence of criminal activity reported in the tip: "In making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of non-criminal acts." *Id.* at 244 n. 13, 103 S.Ct. at 2335 n. 13, 76 L.Ed.2d at 552 n. 13; see also *id.* at 269, 103 S.Ct. at 2348, 76 L.Ed.2d at 568 (opinion concurring in the judgment) (in considering the effect of police corroboration, the proper focus should be on whether the actions of the suspects, whatever their nature, "give rise to an inference that the informant is credible and that he obtained his information in a reliable manner"); *United States v. Peyko, supra* note 32, 717 F.2d at 742; *United States v. Arenal, supra* note 32, 768 F.2d at 267; cf. Kamisar, Gates, *"Probable Cause,"* *"Good Faith" and Beyond,* 69 Iowa L.Rev. 551, 567 (1984) (corroborating facts only support informant's credibility to the extent that they "tend[ ] to give substance and verity to the report that the suspect is engaged in criminal activity").

**38.** *Illinois v. Gates, supra* note 12, 462 U.S. at 244, 103 S.Ct. at 2335, 76 L.Ed.2d at 552–553.

**39.** *Id.*

**40.** *Id.*

**41.** *Id.* at 245, 103 S.Ct. at 2336, 76 L.Ed.2d at 553. The Court stated:

The letter writer's accurate information as to the travel plans of each of the Gates was of a character likely obtained only from the Gates themselves, or from someone familiar with their not entirely ordinary travel plans.
*Id.* at 245, 103 S.Ct. at 2335, 76 L.Ed.2d at 552.

**42.** *Id.* at 246, 103 S.Ct. at 2336, 76 L.Ed.2d at 553.

**43.** 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984).

**44.** *Commonwealth v. Upton,* 390 Mass. 562, 458 N.E.2d 717, 723 (1983). The affidavit presented in support of the warrant stated that after discovery of stolen goods in a hotel room reserved by one Richard Kelleher, a police officer received a call from an unidentified woman who stated that Upton had purchased stolen items from Kelleher and was keeping them in his motor home. The informant gave the address of the motor home, and advised that Upton would probably move it soon because of the raid on Kelleher's room. The informant initially refused to identify herself, but when the officer suggested that she was Lynn Alberico, Upton's girlfriend, she admitted that she was and said that she was giving the information because she had broken up with Upton and " 'wanted to burn him.' " *Massachusetts v. Upton, supra* note 43, 466 U.S. at 729, 104 S.Ct. at 2086, 80 L.Ed.2d at 725 (quoting *Commonwealth v. Upton, supra,* 458 N.E.2d at 718 n. 2). After receiving the tip and verifying that the motor home was at the location the caller had reported, the officer set forth the foregoing facts in the affidavit, and sought and obtained a warrant authorizing a search of the motor home.

*Gates* as merely "adding a new wrinkle" to the *Aguilar-Spinelli* two-prong test by providing that a shortfall on one prong could be overcome by a compelling showing on the other,[45] the Massachusetts court had reasoned that since neither the informant's veracity nor her basis of knowledge appeared adequately in the underlying affidavit,[46] the warrant failed to satisfy even *Gates'* lower threshold of probable cause.[47] The Supreme Court reversed, asserting that the Massachusetts court had "misunderstood" the status of the *Aguilar-Spinelli* standard in determining probable cause.[48] "We did not merely refine or qualify the 'two-prong test,'" the Court said, "[w]e rejected it."[49] Thus the Massachusetts court erred by "judging bits and pieces of information in isolation" instead of considering the totality of the circumstances as demanded by *Gates.*[50] The Court observed that " '[a] grudging or neg-ative attitude by reviewing courts toward warrants'" could tend to discourage use of the warrant process,[51] and that "[a] deferential standard of review is appropriate to further the Fourth Amendment's strong preference for searches conducted pursuant to a warrant."[52]

## III. THE AFFIDAVITS

The warrant authorizing the search of Laws' room was grounded centrally on two affidavits, each executed by Officer Larman.[53] Each affidavit reported information received from a different informant. The District Court upheld the warrant, concluding that the information supplied by the informants, together with that gained from a police investigation, established probable cause to conduct the challenged search.[54] Our review of the record constrains us to affirm.

---

*Massachusetts v. Upton, supra* note 43, 466 U.S. at 730, 104 S.Ct. at 2086, 80 L.Ed.2d at 725.

**45.** *See Massachusetts v. Upton, supra* note 43, 466 U.S. at 730–731, 104 S.Ct. at 2086, 80 L.Ed.2d at 725 (" '[i]t is not clear that the *Gates* opinion has announced a significant change in the appropriate Fourth Amendment treatment of search warrants'") (quoting *Commonwealth v. Upton, supra* note 44, 458 N.E.2d at 720).

**46.** *Massachusetts v. Upton, supra* note 43, 466 U.S. at 731, 104 S.Ct. at 2087, 80 L.Ed.2d at 726.

**47.** *Id.*

**48.** *Id.* at 732, 104 S.Ct. at 2087, 80 L.Ed.2d at 726.

**49.** *Id.*

**50.** *Id.* at 732, 104 S.Ct. at 2087, 80 L.Ed.2d at 727.

**51.** *Id.* at 733, 104 S.Ct. at 2088, 80 L.Ed.2d at 727 (quoting *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684, 689 (1965)).

**52.** *Massachusetts v. Upton, supra* note 43, 466 U.S. at 733, 104 S.Ct. at 2088, 80 L.Ed.2d at 727.

**53.** The two affidavits are reproduced in relevant part in separate appendices (App. I, II) to this opinion, and are hereinafter cited respectively as First Affidavit and Second Affidavit. The warrant was issued by a judge of the Superior Court of the District of Columbia. See Fed.R.

Crim.P. 41(a); D.C.Code Ann. §§ 11–941, 23–501(1), 23–521(a) (1981).

**54.** The District Court's order denying Laws' motion to suppress stated in pertinent part:

> 1. The nature of the information supplied by sources "S–1" and "S–2" including the early morning hour at which the information was given to the police, supports the inference that the sources were on-duty hotel employees, rather than "professional" informers, reporting their personal observations.
>
> * * * * * *
>
> 4. The police investigation also disclosed that one suspect previously had been arrested on a charge of conspiracy to distribute narcotics; the other suspect previously had been convicted of conspiracy to possess, distribute, and import heroin.
>
> 5. The hotel at which the suspects were staying was known to the police to be used for narcotics transactions.
>
> 6. The police have acquired knowledge that motels are frequently used by out-of-town narcotics dealers as a base from which to make local narcotics "contacts." One of the suspects had a New York address.
>
> 7. A period of less than ten (10) hours elapsed from the time the officers received their first information from "S–1" to the time the search warrant was executed.
>
> 8. The affidavits submitted in support of the warrant, together with all reasonable inferences drawn therefrom, and the results of the independent police investigation are sufficient to establish probable cause to search the Defendant's hotel room.

## A. *Sufficiency*

We begin our analysis of the affidavits with the informants' tips, since they offer the principal support for a finding of probable cause. This examination extends to all of the circumstances of the case, including prominently those bearing on the twin concerns of bases of knowledge and veracity of the informants. In evaluating the constitutional adequacy of the affidavits, we remain advertent to the Supreme Court's admonitions to avoid "excessively technical dissection" of the informants' tips,[55] and to "simply ... ensure that the magistrate had a 'substantial basis for ... concluding' that probable cause existed."[56]

### —1. The First Tip

 The first affidavit recounts information furnished by an informant, referred to as "S–1," and police efforts to verify that information.[57] The affidavit indicates little about either the informant's veracity or the basis of his or her knowledge. As we indicated, one of the ways in which

reliability of a tip can be substantiated in one respect is by showing that the informant has proven credible in other instances.[58] But the affidavit merely asserts that "S–1 is a responsible individual,"[59] a claim that does not differ from those made by the *Aguilar* and *Spinelli* affiants that their informants were "reliable."[60] Such self-serving labels are not substitutes for facts upon which a magistrate can assay the reliability of the source,[61] nor is an effort in that direction assisted by the affiant's additional statement that S–1 "has been gainfully employed for more than three (3) years."[62] This assertion, while reflecting a degree of economic stability, does not give any real indication regarding honesty or accuracy.[63]

The reliability of an informant's affidavit may also be established by external circumstances tending to show that information he supplies deserves credit.[64] This is often accomplished through independent verification of particular aspects of the informant's story.[65] The only attempt at corroboration

*United States v. Laws,* Crim. No. 81–244 (D.D.C. Sept. 3, 1981) (order) at 1–2, Appellant's Appendix (A.App.) 11–12.

**55.** *Massachusetts v. Upton, supra* note 43, 466 U.S. at 732, 104 S.Ct. at 2087, 80 L.Ed.2d at 726 (citing *Illinois v. Gates, supra* note 12, 462 U.S. at 234–235, 103 S.Ct. at 2330, 76 L.Ed.2d at 545–546).

**56.** *Illinois v. Gates, supra* note 12, 462 U.S. at 244–245, 103 S.Ct. at 2335, 76 L.Ed.2d at 551–552 (quoting *Jones v. United States, supra* note 5, 362 U.S. at 271, 80 S.Ct. at 736, 4 L.Ed.2d at 708); see also *Massachusetts v. Upton,* 466 U.S. at 732–733, 104 S.Ct. at 2087, 80 L.Ed.2d at 726.

**57.** See First Affidavit, App. I *infra.*

**58.** See notes 37–39 *supra* and accompanying text.

**59.** First Affidavit ¶ 2, App. I *infra.*

**60.** See text *supra* at notes 17, 19.

**61.** See text *supra* at notes 17–18, 21–22. Facts may be easy to come by in the type of situation presented here, in which the affiant is aware of the informant's identity and presumably has had an opportunity to gather information on his or her credibility. Compare *Illinois v. Gates, supra* note 12 (identity of informant unknown to police). See also Wasserstrom, *The Incredi-*

*ble Shrinking Fourth Amendment,* 21 Am.Crim. L.Rev. 257, 334 (1984):

> Where police seek a warrant, probable cause is to be determined by the magistrate, not the police. Therefore, the police should be required to tell what they know about the source of his information, rather than merely assert in conclusory terms that he is credible or reliable. This is the teaching of *Aguilar,* and that teaching is reaffirmed in *Gates.* In *Gates* the police told the magistrate everything they knew....

**62.** First Affidavit ¶ 2, App. I *infra.*

**63.** Much better, for example, would be information describing ongoing cooperation with the police as a contact or "agent" in the investigation at issue. See *United States v. Woolery,* 670 F.2d 513, 515–516 (5th Cir.), *cert. denied,* 459 U.S. 835, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982). Perhaps more common is a recitation of the informant's "track record" in providing information leading to arrests or convictions. See, e.g., *United States v. Bruner,* 212 U.S.App.D.C. 36, 55, 657 F.2d 1278, 1297 (1981).

**64.** See text *supra* at notes 30–32.

**65.** See notes 34–38 *supra* and accompanying text; see also, e.g., *United States v. Myers, supra* note 23, 176 U.S.App.D.C. at 78, 538 F.2d at 426;

of S-1's information, however, was a check for criminal records on Laws and one Vaughn A. Sneed, the two individuals named in the affidavit.[66] The discovery that the suspects had previously been implicated in drug activity [67] certainly heightened suspicion and warranted further investigation by police. But more was required to credit S-1's statement that the two men were "currently conducting an illicit drug business" at the Holiday Inn.

The first affidavit is similarly lacking with respect to a reported basis for S-1's knowledge. There is no suggestion of first-hand observation, nor is there any other account of the informant's mode of perception. The information conveyed—that Laws and Sneed had checked into designated rooms at the motel and were then and there trafficking in drugs,[68] though precise, was not of such nature or extensive detail as to permit an inference that only someone who had actually observed the activity spoken of could have so described it.[69]

We conclude, then, that the tip contained in the first affidavit, standing alone, did not provide a "substantial basis" for a finding of probable cause.[70] That does not mean, however, that the affidavit must be ignored. Under the *Gates* approach, a finding on probable cause must be predicat-

ed upon a view of the totality of all relevant circumstances.[71] It remains to be seen whether the first tip may yet attain greater stature in conjunction with other information.

—2. The Second Tip

We turn to the second tip and there we find a basis for the informant's knowledge strongly exhibited. S-2, the informant in the second affidavit, states that he heard Laws and Sneed discussing the distribution of "narcotics in white powder form" [72] and that he saw Sneed depart from the motel shortly after each of the reported "drug-related conversation[s]" took place.[73] An assertion of firsthand observation by an informant is, of course, highly preferable to an indication that he or she acquired the information indirectly. But we still must determine whether there was adequate reason to credit the claim that S-2 actually saw and heard the activities which the second affidavit attributes to Laws and Sneed.

To say the least, the affidavit leaves S-2's veracity far from obvious. The fact that S-2, like S-1, is gainfully employed, as the second affidavit states,[74] does little to show that S-2 was truthful in his dealings with the police.[75] And while several courts

---

*United States v. Canieso*, 470 F.2d 1224, 1231 (2d Cir.1972).

66. First Affidavit ¶ 3, App. I *infra*. Officer Larman did not verify that Laws and Sneed occupied the rooms that S-1 said they did until after receiving S-2's tip. See Second Affidavit ¶ 5, App. II *infra*.

67. Local police files disclosed that Sneed had been arrested in 1974 for conspiracy to distribute a controlled drug. First Affidavit ¶ 3, App. I *infra*. Officer Larman subsequently learned that Laws had been arrested in England with seven pounds of heroin, extradited to the United States, and convicted on drug charges, but this information did not become available until after the first affidavit was executed. Second Affidavit ¶ 2, App. II *infra*.

68. First Affidavit ¶ 1, App. I *infra*.

69. See note 23 *supra*.

70. See text *supra* at note 31.

71. See notes 24–29 *supra* and accompanying text; see also *United States v. McEachin*, 216 U.S.App.D.C. 320, 325 & n. 6, 670 F.2d 1139, 1144 & n. 6 (1981).

72. Second Affidavit ¶ 1, App. II *infra*.

73. *Id.*, App. II *infra*.

74. *Id.* ¶ 4, App. II *infra*.

75. See text *supra* at notes 62–63. Although the Fourth Amendment does not require disclosure of an informant's identity, e.g., *McCray v. Illinois*, 386 U.S. 300, 311, 87 S.Ct. 1056, 1062, 18 L.Ed.2d 62, 70–71 (1967), several courts and commentators have noted that in-camera questioning thereon by the trial judge would facilitate assessments of credibility and still protect the Government's interest in effective law enforcement. Information thus garnered might save what otherwise would be a deficient affidavit. See, e.g., *United States v. Manley*, 632 F.2d 978, 985–986 (2d Cir.1980), *cert. denied*, 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981). See

have inferred reliability when the informant is an inadvertent witness to criminal activity, either as a bystander or victim,[76] it seems inappropriate to do so with respect to S–2. Casual bystanders do not commonly overhear highly incriminating conversations regarding sales of narcotics. As it has aptly been said,

> [i]t would seem that courts should be cautious in accepting the assertion that one who apparently was present when narcotics were used or displayed is a presumptively reliable citizen-informer.... [T]his is because as a general proposition it is an informant from the criminal milieu rather than a law-abiding citizen who is most likely to be present under such circumstances. This is not to suggest that a person giving information about the location of narcotics may *never* qualify as a citizen-informer, for it is sometimes possible to show with particularity how a law-abiding individual happens to come upon such knowledge. Rather, the point is that in such a case it should not be deemed sufficient that the police have alleged in a rather conclusory fashion that the person was "a responsible citizen of utmost character and integrity" or "a reputable member of the community." [77]

■ Closer examination of both of the affidavits, considered together, however, reveals clearer indicia of the reliability of S–2's information. The second affidavit sets forth a verification by Officer Larman that the rooms identified by S–2 were registered respectively in the names of Laws and Sneed.[78] This revelation tended to corroborate S–1's statements, as well as those of S–2, since both informants placed Laws and Sneed in the same rooms at the same motel.[79] Although specific knowledge of these registrations does not alone verify a charge that the registrants are trafficking in narcotics, such corroboration as it does provide is an integral part of the probable-cause mix.[80] An informant known to be right in some factual assertions is more likely to be right about other facts communicated.[81] By the same token, the fact that *both* S–1 and S–2 knew the names of the two men and the particular rooms they occupied provides some foundation for crediting the statements of both concerning other activities of the suspects. Moreover, as we have indicated, S–2's account suggests that he had some opportunity, albeit undescribed, to witness the alleged wrongdoing in some way.[82] It is clear from *Gates* that, in measuring overall the reliability of a tip, a fair indication of the informant's basis of knowledge may compensate for a less than conclusive demonstration of his credibility.[83]

---

also cases in 1 W. LaFave, *supra* note 23, § 3.3, at 583, and Rebell, *The Undisclosed Informant and the Fourth Amendment: A Search for Meaningful Standards,* 81 Yale L.J. 703 (1972). Fed. R.Crim.P. 41(c)(1) provides for questioning of the affiant by the judge or magistrate issuing the warrant. Since, as noted, note 61 *supra,* the officer probably did have additional information about the informant, that step would have been desirable in this case.

**76.** See *United States v. McEachin, supra* note 71, 216 U.S.App.D.C. at 323–324, 670 F.2d at 1142–1143; *United States v. Burke,* 517 F.2d 377, 380 (2d Cir.1975); *United States v. Hunley,* 567 F.2d 822, 827 & n. 8 (8th Cir.1977); *United States v. Pennington,* 635 F.2d 1387, 1391 (10th Cir.1980), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981).

**77.** *United States v. Button,* 653 F.2d 319, 326–327 (8th Cir.1981) (quoting 1 W. LaFave, *supra* note 23, § 3.4, at 601–602) (emphasis in original; footnote omitted).

**78.** Second Affidavit ¶ 5, App. II *infra.*

**79.** See First Affidavit § 1, App. I *infra.*

**80.** *United States v. Davis,* 147 U.S.App.D.C. 400, at 402, 458 F.2d 819, 821 (1972). See note 37 *supra.*

**81.** *Illinois v. Gates, supra* note 12, 462 U.S. at 244, 103 S.Ct. at 2335, 76 L.Ed.2d at 552 (citing *Spinelli v. United States, supra* note 6, 393 U.S. at 427, 89 S.Ct. at 594, 21 L.Ed.2d at 650 (concurring opinion)).

**82.** See text *supra* following note 73.

**83.** The Court stated: "[E]ven if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case." 462 U.S. at 234, 103 S.Ct. at 2329–2330, 76 L.Ed.2d at 545.

Finally, the mutually-supporting nature of the two tips is an important ingredient in the probable-cause mix. There is no indication that the informants were acting cooperatively. The fact that two apparently unassociated persons make the same assertion increases the probability that it is true.[84]

—3. The Independent Police Investigation

In addition to the mutually-reinforcing character of the tips, at least one of which rested ostensibly on first-hand knowledge, the information related in the affidavits when coupled with behavior observed by the police themselves produces a composite much more consistent with illegal than innocent activity.

Officer Larman's disinterment of the criminal records of Laws and Sneed, both of whom had been implicated in serious drug violations, bears weightily on the issue of probable cause. As the Supreme Court has held, a conviction—surely the outcome in Laws' instance[85]—favors a finding of probable cause in a way that "bald and unilluminating assertions" of a suspect's reputation do not.[86] Furthermore, the events observed and reported by

the informants appeared even more suspicious when they were subjected to scrutiny by an expert. Officer Larman, who was both the investigator and the affiant, had spent more than a decade in tracking down distributors of narcotics.[87] His experience in covering the machinations of drug dealers enabled him to fit the informants' descriptions of the suspects' behavior into a pattern familiar to drug-law enforcers.[88] Laws and Sneed were registered not at just any motel, but at one commonly used by drug dealers.[89] Officer Larman avowed that it was common for an out-of-town dealer and a local resident, as seemingly Laws and Sneed respectively were,[90] to be working in tandem.[91] The officer thus recognized the series of events reported by S–2 as a modus operandi typical of professionals in the drug trade.[92]

■ Law-enforcement officers may draw upon their expertise in translating activity that appears innocuous to the untrained mind into grounds supporting a search or arrest warrant.[93] Here, the second tip described a scenario which to Officer Larman was telltale. In assessing probable cause, as the Supreme Court has declared, " 'the evidence ... collected must be seen and weighed not in terms of analysis by schol-

**84.** *United States v. Hyde,* 574 F.2d 856, 863 (5th Cir.1978) ("[w]hen three unreliable but unconnected persons all report the same fact, it is probable that the fact is true").

**85.** Second Affidavit ¶ 2, App. II *infra;* see also First Affidavit ¶ 3, App. I *infra.*

**86.** *Spinelli v. United States, supra* note 6, 393 U.S. at 414, 89 S.Ct. at 588, 21 L.Ed.2d at 643; see also *Jones v. United States, supra* note 5, 362 U.S. at 271, 80 S.Ct. at 735, 4 L.Ed.2d at 707 ("that petitioner was a known user of narcotics made the charge against him much less subject to scepticism than would be such a charge against one without such a history"); *United States v. Berry,* 150 U.S.App.D.C. 187, 192–193, 463 F.2d 1278, 1283–1284 (1972); *United States v. Settegast, supra* note 32, 755 F.2d at 1122.

**87.** Second Affidavit ¶ 3, App. II *infra.*

**88.** *Id.* ¶ 3, App. II *infra.*

**89.** *Id.* ¶ 3, App. II *infra.*

**90.** Following receipt of the first tip, Officer Larman verified Sneed's District of Columbia ad-

dress. First Affidavit ¶ 3, App. I *infra.* Laws' New York City address was not verified, although his New York conviction was. Second Affidavit ¶ 2, App. II *infra.*

**91.** Second Affidavit ¶ 3, App. II *infra.*

**92.** See *id.,* App. II *infra;* see also *United States v. Algie,* 721 F.2d 1039, 1044 (6th Cir.1983) (dissenting opinion) ("[o]ne factor relevant to the magistrate's review of the 'totality of circumstances' is the *modus operandi* of the criminal conduct involved").

**93.** See *United States v. Lucas, supra* note 32, 250 U.S.App.D.C. at 267, 778 F.2d at 887; *United States v. Green,* 216 U.S.App.D.C. 329, 334, 670 F.2d 1148, 1152 (1981); *United States v. Garcia-Hernandez,* 623 F.2d 496, 499 (7th Cir.1980); see also *United States v. Brignoni-Ponce,* 422 U.S. 873, 885, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607, 619 (1975); *Terry v. Ohio,* 392 U.S. 1, 37, 88 S.Ct. 1868, 1880–1882, 20 L.Ed.2d 889, 906–908 (1968).

ars, but as understood by those versed in the field of law enforcement.' " [94] What Officer Larman did was match the informant-reported conduct of Laws and Sneed with a stereotype he knew to be in vogue in the underworld of crime.[95] His knowledge and expertise enabled him to crystallize a composite of informant-observations, record checks and other circumstances into a decent showing of probable cause.

A deduction of possible criminality often is warranted when a law-enforcement officer witnesses suspicious behavior personally. Perhaps more often, however, first-hand observation—particularly of a crime like drug-trafficking, which usually is accomplished professionally and furtively—is well-nigh impossible, and the use of informants is imperative. Under the totality-of-the-circumstances test, resort to information they supply is entirely appropriate " 'so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.' " [96]

■ We think the needed corroboration is present here. When, advertently to *Gates*, we examine all of the circumstances, we see the facts communicated by the tips, the mutually-reinforcing character of the affidavits, the suspects' records of involvement in drug trafficking, their operational methodology, the highly suspicious nature of their activities, and the inferences that Officer Larman could reasonably draw from this array. We conclude that the combination of these elements adequately manifested a fair probability that criminality was afoot, and provided a substantial basis for a finding of probable cause justifying a follow-up search of Laws' motel room.

## B. *Freshness and Specificity*

Laws advances two further objections to the warrant. He argues that the information included in the affidavits was too stale to satisfy constitutional requirements,[97] and that the facts as narrated were not specific enough to support a finding of probable cause.[98] We find neither contention meritorious.

■ Considering first the staleness challenge, it is true that exactly when S–2 overheard the conversations he related is not disclosed. But it is clear from the affidavit that the conversations allegedly were overheard sometime during the sojourn of Laws and Sneed at the Holiday Inn. Officer Larman checked the guest register within hours after receiving the tips, and found the two registered as the occupants of the rooms in which both S–1 and S–2 said they were.[99] The situation is readily distinguishable from *United States v. Salvucci*,[100] a case in which the failure to supply the date on which an informant allegedly overheard a conversation was deemed fatal because the warrant was not issued until two months after the time the conversation supposedly took place.[101] In *United States v. Button*,[102] the other case upon which Laws relies, police had collected information on a suspect over a period of six months. There was no way of ascertaining whether information that might have been accurate early in the period was still reliable when the warrant issued, and averments that contraband was "current-

---

**94.** *Illinois v. Gates, supra* note 12, 462 U.S. at 232, 103 S.Ct. at 2328, 76 L.Ed.2d at 544 (quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981)).

**95.** See note 92 *supra.*

**96.** *Illinois v. Gates, supra* note 12, 462 U.S. at 242, 103 S.Ct. at 2334, 76 L.Ed.2d at 550 (quoting *Jones v. United States, supra* note 5, 362 U.S. at 269, 80 S.Ct. at 735, 4 L.Ed.2d at 708).

**97.** See *Sgro v. United States*, 287 U.S. 206, 210, 53 S.Ct. 138, 140, 77 L.Ed. 260, 262–263 (1932).

**98.** See *United States v. Hinton*, 219 F.2d 324, 326 (7th Cir.1955); *United States v. Hansen*, 652 F.2d 1374, 1386 (10th Cir.1981).

**99.** See First Affidavit ¶ 1, App. I *infra;* Second Affidavit ¶ 5, App. II *infra.*

**100.** 599 F.2d 1094 (1st Cir.1979), *rev'd on other grounds*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980).

**101.** See *id.* at 1096–1097.

**102.** *Supra* note 77.

ly" in the residence designated could not cure the deficiency.[103] In the case before us, however, the entire episode consumed less than ten hours,[104] and the mere fact that Officer Larman likewise used the words "currently" and "presently" in his affidavits [105] does not impair the logical unfolding of the rapid sequence of events they narrate.

■ Laws' argument on specificity is that the affidavits did not establish a nexus between the two rooms searched and an illicit drug enterprise. He insists that neither the tips nor Officer Larman's independent investigation "pointed to the existence of contraband in room 231 or 234," and that the tips equally supported an inference that the officer "contacted an informant who possessed general knowledge of [Laws'] reputation and activities that was completely divorced from the circumstances existing at the Holiday Inn." [106] In urging this claim Laws perceives a fatal similarity between this case and two others in which search-warrant affidavits were held to be infirm.[107] We find the decisions cited by Laws inapposite.

In *United States v. Hansen*,[108] the affidavit presented the scenario following. Federal agents learned from one Thomas that his source would arrive from Florida and make a delivery of cocaine at a motel. The agents followed Thomas to the motel, at which the three suspects had recently registered in separate rooms, and observed Thomas in the vicinity of those rooms.

Thomas later sold cocaine to an undercover agent and told the agent that the source had an additional quantity of cocaine in a room at the motel. A search warrant issued, the three rooms were searched, and several bags of cocaine were found. The question on appeal was whether as a matter of law this information supported the magistrate's determination of probable cause for the search,[109] and the court answered in the negative. "Probable cause," said the court, "was not adequately shown since there was no showing that one individual registered for the entire block of rooms, or that the three rooms had inner connecting doors, thus making the rooms in essence one area." [110] The court noted further that the affidavit did not assert that Thomas had entered or exited from any of the rooms mentioned in the affidavit, but only that he was later seen walking near those rooms.[111]

In *United States v. Hinton*,[112] the other case upon which Laws relies, a search warrant issued on an affidavit stating that the affiant had witnessed sales of heroin by four women operating under four aliases at a designated address, which was the site of a building containing four apartments. The warrant authorized a search of all of the building, and accordingly that was done. The court found the warrant too general to be upheld. "[T]he affidavit does not establish probable cause to search the entire building without the allegation of

---

**103.** 653 F.2d at 325.

**104.** *United States v. Laws, supra* note 54, at 2, A. App. 12, reproduced in note 54 *supra.*

**105.** See First Affidavit ¶ 1, App. I *infra;* Second Affidavit ¶ 6, App. II *infra.*

**106.** Brief for Appellant at 17.

**107.** *United States v. Hinton, supra* note 98; *United States v. Hansen, supra* note 98.

**108.** *Supra* note 98.

**109.** The affidavit further stated that one of the agents peered through partially open draperies of one of the rooms and saw therein four plastic bags containing a white powder. 652 F.2d at

1385. The District Court, however, found that this statement was false, and on appeal this finding was sustained as not clearly erroneous. *Id.* at 1386. As the Tenth Circuit further held, "[a] necessary consequence of the finding that the drugs were not in plain view is the excision of the statement to that effect in the affidavit as false." *Id.* (citing *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)). The court thus had to determine whether the remaining facts set forth in the affidavit sufficed to establish probable cause. 652 F.2d at 1386.

**110.** *United States v. Hansen, supra* note 98, 652 F.2d at 1386.

**111.** *Id.*

**112.** *Supra* note 98.

facts to show that each of the apartments in the building was the residence of at least one of the persons alleged in the affidavit to have been seen selling narcotics." [113]

The case at bar differs drastically. S–2 identified Laws and Sneed as the participants in "drug related conversations" and other suspicious behavior,[114] and S–1 identified rooms 231 and 234 as the ones they occupied at the Holiday Inn.[115] A report of conversations on drug transactions between two named persons registered in two designated rooms of a designated motel is certainly specific enough to enable a finding of probable cause to search those rooms. Contrary to Laws' suggestion, neither *Hansen* nor *Hinton* requires actual observation of the illegal activity or contraband in the rooms to be searched. To do so would be to elevate probable cause to the status of positive cause.[116]

We hold that the affidavits in the case at bar provided the judge issuing the warrant with "a 'substantial basis for ... concluding' that probable cause existed"[117] to search room 234 of the Holiday Inn. It follows that the evidence seized therefrom was admissible at Laws' trial. His convictions are accordingly

*Affirmed.*

## APPENDIX I

### THE FIRST AFFIDAVIT *

■ On Monday, March 30, 1981, about 0300 hrs. the affiant received information from a source, hereafter referred to as S–1, that there was a possibility that two male subjects staying at the Holiday Inn, located at 730 Monroe Street, Norheast [*sic*], Washington, D.C., are currently conducting an illicit drug business. S–1 went on to state that the two subjects are checked into two different rooms and checked into them

about the same time. S–1 provided the name of the subject staying in room # 234 of the Holiday Inn as Glenston P. Laws of 1725 York Ave., N.Y., N.Y. S–1 then provided the name of the subject staying in room # 231 as Vaughn H. Sneed of 5930 14th Street, Northwest, Washington, D.C.

■ S–1 is a responsible individual who has been gainfully employed for more than three (3) years.

■ On Monday, March 30, 1981, about 0345 hrs., the affiant made a check of the Narcotic Branch File and discovered that a Vaughn Harry Sneed, D.O.B. 9–12–44, SSN 577–58–1807, was arrested on June 25, 1974 for Conspiracy to distribute LSD. A check of the Wales Computer related that a Vaughn Harry Sneed, same date of birth and social security number, holds a valid District of Columbia drivers permit which listed an address of 5930 14th St., Northwest, Washington, D.C., Apt. # 304. No local arrest record has been located on the subject, Glenston P. Laws, at the time of the formulation of this affidavit. The affiant has further requested the New York District Office of the Drug Enforcement Administration for a check on both subjects, Vaughn H. Sneed and Glenston P. Laws. At the time of the formulation of this affidavit no response has been received.

\* \* \* \* \*

## APPENDIX II

### THE SECOND AFFIDAVIT*

■ On Monday, March 30, 1981, at about 0400 hrs. the affiant made contact with a source of information, hereafter referred to as S–2. S–2 related that it had overheard the subject, Glenston P. Laws, involved in conversations that S–2 identified as drug related, that is, heroin. As further by S–2 to the affiant, the drug

---

**113.** 219 F.2d at 326.

**114.** Second Affidavit ¶ 1, App. II *infra.*

**115.** First Affidavit ¶ 1, App. I *infra.*

**116.** See text *supra* at note 29.

**117.** See text *supra* at note 28.

\* To facilitate references hereto, paragraphs have been numbered.

related conversations revolved around the packaging and distribution of narcotics in white powder form. S–2 stated that after the subject, Glenston P. Laws, would make arrangements to have narcotics delivered to a location, the subject, Vaughn H. Sneed would depart the motel after each arrangement and return a short time later. S–2 further related that the subject, Glenston P. Laws, was overheard discussing the weight in pounds of a substance not known to S–2.

■ On Monday, March 30, 1981, at 0830 hrs., Special Agent, John Herbert, Drug Enforcement Administration, New York District Office, related to the affiant that on March 19, 1978, Glenston Paige Laws, D.O.B. 5-4-48, was arrested at Heathrow Airport, England, with seven (7) pounds of heroin. Further related that, Glenston P. Laws was extradited to the United States to face Federal Drug Law Violations and was convicted of conspiracy to possess, distribute, import heroin. On June 15, 1979, Glenston P. Laws was sentenced to two (2) years imprisonment and five years probation. S/A John Herbert provided additional information on the identification of Glenston P. Laws: U.S. Citizen, Negro Male, 6'2", 180 lbs., scar on right wrist, S.S.N. 207–36–1085, F.B.I. No. # 813612G.

■ The affiant has been a member of the Narcotic Branch, Morals Division, M.P. D.C., for more than eleven (11) years and during this time has developed knowledge through past proven reliable sources of information and investigation that illicit heroin trafficers [sic] from New York City and other locations will, after traveling to Washington, D.C. check into a motel room and begin contacting local illicit narcotic distributors to sell there [sic] drugs too [sic]. The affiant has personally made arrest [sic] of individuals inside the Holiday Inn at 730 Monroe St., Northeast, Washington, D.C., which resulted in the seizure of heroin.

■ S–2 is a responsible citizen and has been gainfully employed for more than two years.

■ On Monday, March 30, 1981, at 0530 hrs., the affiant made a check of the Guest Registration at the Holiday Inn, 730 Monroe St., Northeast, Washington, D.C., and noted the following: On March 29, 1981 at 2133 hrs. Glenston P. Laws checked into room # 234, folio # 48281. On March 29, 1981 at about 2137 hrs., Vaughn H. Sneed checked into room # 334 and after a short period of time requested to be moved to 231 and was so. Folio No. # 48282.

■ The affiant, based on the facts set forth in this affidavit, firmly believes that Glenston Paige Laws and Vaughn Harry Sneed are presently distributing and causing to be distributed illicit narcotic drugs, to wit, heroin, from within the rooms # 234 and # 231 of the Holiday Inn located at 730 Monroe St., Northeast, Washington, D.C. Further that there is probable cause to believe evidence of the illicit possession and distribution of heroin or any other type of narcotic drug or records that demonstrate control and distribution of illicit narcotic drugs are present within the rooms and the affiant respectfully request [sic] search warrant for both # 231 and # 234 rooms at the Holiday Inn, 730 Monroe St., Northeast, Washington, D.C.